Petitioner: Victor Hugo DOMINGO–GOMEZ,

v.

Respondent: The PEOPLE of the State of Colorado.

No. 04SC640.

Supreme Court of Colorado.

Dec. 19, 2005.

Rehearing Denied Jan. 9, 2006.*

---

* Justice BENDER would grant the Petition for Rehearing.

David S. Kaplan, Colorado State Public Defender, Katherine Brien, Deputy State Public Defender, Denver, for Petitioner.

John W. Suthers, Attorney General, Karen E. Lorenz, Assistant Attorney General, Denver, for Respondent.

MARTINEZ, Justice.

The defendant, Victor Domingo–Gomez, appeals his conviction for the use of an explosive or incendiary device, first degree arson, attempted first degree assault, and the possession of an explosive or incendiary device for throwing two Molotov cocktails into the victims' residence on September 21, 2001. During the State's closing argument, the prosecution remarked that Domingo–Gomez and defense witnesses lied, testified untruthfully, and made up their stories. The trial

court sustained the judge's own objection to the prosecutor's use of the word "lied" during the closing argument. During rebuttal closing, the prosecution further commented that the evidence supporting guilt was sufficient to meet the State's "screening process." Domingo–Gomez appealed his conviction on the basis that these improper statements violated his right to a fair trial by an impartial jury. In an unpublished opinion, the court of appeals affirmed his convictions. *People v. Domingo–Gomez*, No. 02CA1993, slip op. at 6, 2004 WL 1949852, *1 (Colo.App.2004).

We granted certiorari and now affirm the court of appeals.

## I. Facts and Procedural History

The following facts are undisputed. Late in the evening on September 21, 2001, sisters Stephanie and Veronica Baldizan invited several friends over to their home. Defendant Victor Domingo–Gomez and Mike Fernandez, referred to as "Mike" by the witnesses, attended the party. Also in attendance was Paul Baldizan, who resided with his sisters, and their cousin Angelo (last name unknown). Alcoholic beverages were consumed by all of the attendees, except Veronica Baldizan.

Several hours after the party began, Angelo mistakenly accused the attendees of taking his cell phone. Paul Baldizan requested that everyone leave after the partygoers were unable to locate it. A fight then broke out between Paul Baldizan and Domingo–Gomez over the party's end. Paul Baldizan "got the best of the fight," but witnesses differed about how injured Domingo–Gomez was. After the fight, Mike Fernandez and Domingo–Gomez left the Baldizan residence.

Around six o'clock the next morning, someone threw two Molotov cocktails[1] into the Baldizan residence. One of the Molotov cocktails struck Stephanie Baldizan, and the other exploded in the back bedroom. In relation to these events, Domingo–Gomez

was charged with the use of an explosive or incendiary device, section 18–12–109(4), C.R.S. (2005); first degree arson, section 18–4–102, C.R.S. (2005); attempted first degree assault, sections 18–2–101(1), 18–3–202, C.R.S. (2005); and the possession of an explosive or incendiary device, section 18–12–109(2), C.R.S. (2005).

The events occurring after Domingo–Gomez' departure from the Baldizan residence were highly contested at trial. Stephanie Baldizan testified that in the early morning hours of September 22, 2001, she was in the back room of her house when she heard a dog barking outside. She opened the window blinds to see what was going on and an unlit Molotov cocktail was thrown towards the window. The Molotov cocktail broke through the window. The bottle shattered, covering Stephanie Baldizan's body with gasoline and temporarily blinding her. As she screamed for Veronica Baldizan to call the police and take her young daughter outside, a second Molotov cocktail was thrown into the back bedroom. The second Molotov cocktail was lit and exploded upon contact, causing extensive fire damage. No fingerprints were found on the bottle remnants and no other physical evidence linked the defendant to the crime. Stephanie Baldizan positively identified Domingo–Gomez as the individual who threw the Molotov cocktail at her. No one else personally witnessed these events.

Domingo–Gomez took the stand in his own defense. Noberto Menchaca and Juan Carlos Toledo also testified on Domingo–Gomez' behalf. They testified that Stephanie Baldizan mistakenly identified Domingo–Gomez as the perpetrator. To support the misidentification theory, Domingo–Gomez and his witnesses testified that Domingo–Gomez was elsewhere at the time of the crime. Domingo–Gomez testified that after the fight, he was severely injured, potentially even having

---

1. A Molotov cocktail is a "breakable container containing an explosive or flammable liquid or other substance, having a wick or similar device capable of being ignited, and may be described as either an explosive or incendiary device." § 9–7–103(5), C.R.S. (2005). Molotov cocktails are not necessarily commercially manufactured, but

can be created by any container filled with an explosive or flammable substance that is intended to be used as a weapon and not solely for illumination. *Id.* The Molotov cocktail used in this case was a beverage bottle filled with gasoline with a piece of cloth protruding through the neck of the bottle.

knife wounds. Mike Fernandez helped the defendant get into a car and then drove him to Juan Carlos Toledo's house. Domingo–Gomez did not own a car or have a valid driver's license at that time.

Toledo testified that he then brought Domingo–Gomez to Norberto Menchaca's house. Menchaca testified that the pair arrived at approximately 2:00 or 3:00 a.m. on September 22, 2001, and that Domingo–Gomez was severely injured and still intoxicated. Toledo brought Domingo–Gomez to Menchaca's house because the defendant refused to go to the hospital. Menchaca cleaned and bandaged Domingo–Gomez' wounds. Menchaca's friend George Bonar then gave Domingo–Gomez a pain killer. Menchaca, Toledo, and Domingo–Gomez all testified that the defendant then fell unconscious and slept until about 9:00 a.m. that morning.

The meaning of a comment made during the arrest of Domingo–Gomez was also disputed. Around 4:00 a.m. on November 19, 2001, Investigator Jason Norris of the Denver Fire Department arrested Domingo–Gomez at his residence. The defendant's younger brother, Mike, was also in the room at the time. Confusing the defendant's younger brother with Mike Fernandez, Investigator Norris believed the he may have been with Domingo–Gomez the night of the firebombing. Investigator Norris, therefore, asked to speak with him in relation to the arson. Without prompting, Domingo–Gomez stated "He wasn't even there." Investigator Norris interpreted this comment as an admission that Domingo–Gomez, and not his brother, was involved in the firebombing. The defense, however, argued this statement meant that the defendant's brother was not around during Domingo–Gomez' fight with Paul Baldizan.

Paul Baldizan also gave undisputed testimony about an event occurring in January 2002. While Paul Baldizan and a friend walked down Federal Avenue, Mike Fernandez approached him and stated that he knew where Paul Baldizan lived and challenged Baldizan to fight him. Mike Fernandez further called Paul Baldizan a snitch and stated "I will use your jersey to burn your house down." Paul Baldizan testified that he did

not know exactly what Mike Fernandez meant by that comment except that "he was just stating that he would do it ... [and][i]f it happened once, he'll do it again."

During the People's closing argument, the prosecutor stated that Domingo–Gomez and other defense witnesses lied, testified untruthfully, and/or made up their stories. The prosecutor further remarked in rebuttal closing that the State has a "screening process" that cases must go through before charges are filed and that the evidence in this case was sufficient to pass through that process.

During the jury deliberations, the jury sent several questions to the trial court. One request asked to review the transcripts of certain witnesses. The trial court responded by telling them to "rely on their own recollections." The jury sent a further question asking:

> What do we do if we are split; what are the repercussions? [7 of us believe defendant is guilty 4 of us believe state hasn't met the burden of proof due to identification of defendant 1 of us is still unsure.]

The trial court answered "Please continue your deliberations."

The jury found Domingo–Gomez guilty on all counts. The trial judge merged the use of an explosive or incendiary device, attempted first degree assault, and possession of an explosive or incendiary device counts. Domingo–Gomez was sentenced to the Department of Corrections for twenty-four years for the use of an explosive or incendiary device and twenty-four years for arson, to run concurrently, with five years of mandatory parole upon release.

Domingo–Gomez appealed on the ground that the prosecutor's statements during closing argument deprived him of his right to a fair trial by an impartial jury and mandated the reversal of his convictions. In an unpublished opinion, the court of appeals affirmed Domingo–Gomez' conviction. *Domingo–Gomez*, slip op. at 6, at *1.

We granted certiorari and now affirm the

judgment of the court of appeals.[2]

## II. Prosecutor's Statements

Domingo–Gomez argues that the prosecutor repeatedly made improper and prejudicial remarks during her closing argument, which violated his right to a fair trial by an impartial jury. Domingo–Gomez alleges that the prosecutor's statements that he and other defense witnesses lied, testified untruthfully, made up their stories, and that his case went through a "screening process" prior to the filing of charges were so prejudicial as to warrant a reversal of his convictions.

In reviewing Domingo–Gomez' claim, we must first review whether the prosecutor's statements were improper. We then address whether the prosecutor's improper remarks warrant reversal. *See Harris v. People,* 888 P.2d 259, 265–67 (Colo.1995). In making this determination, we necessarily take into account the differences among the four remarks, including the language used, context, and whether a contemporaneous objection was made.

### A.

We have repeatedly stated that "a prosecutor, while free to strike hard blows, is not at liberty to strike foul ones." *Wilson v. People,* 743 P.2d 415, 418 (Colo.1987) (internal quotations omitted) (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). While a prosecutor can use every legitimate means to bring about a just conviction, she has a duty to avoid using improper methods designed to obtain an unjust result. *Wilson,* 743 P.2d at 418 (citing *Berger,* 295 U.S. at 88, 55 S.Ct. 629). Overzealous advocacy that undermines the quest for impartial justice by defying ethical standards cannot be permitted. *Harris,* 888 P.2d at 265.

The prosecutor's duty to advocate for justice within permissible means has constitutional underpinnings. Each individual has a right to a trial by a fair and impartial jury under the Sixth Amendment to the United States Constitution and Article II, sections 16 and 23 of the Colorado Constitution. *People v. Rodgers,* 756 P.2d 980, 983 (Colo.1988); *People ex rel. Faulk v. Dist. Court,* 673 P.2d 998, 1000 (Colo.1983). This right includes the right to have an impartial jury decide the accused's guilt or innocence solely on the basis of the evidence properly introduced at trial. *See Oaks v. People,* 150 Colo. 64, 68, 371 P.2d 443, 447 (1962). A jury that has been misled by improper argument cannot be considered impartial. *Harris,* 888 P.2d at 264 (citing *Oaks,* 150 Colo. at 68, 371 P.2d at 446–47). Thus, a prosecutor must stay within the ethical boundaries outlined by this court during closing argument or risk reversal. *See People v. Rodriguez,* 794 P.2d 965, 972 (Colo.1990).

Final argument may properly include the facts in evidence and any reasonable inferences drawn therefrom. *People v. DeHerrera,* 697 P.2d 734, 743 (Colo.1985). Indeed, closing argument allows advocates to point to different pieces of evidence and explain their significance within the case. *See Davis v. State,* 117 P.3d 454, 463 (Wyo.2005). Counsel may also touch upon the instructions of law submitted to the jury. Crim. P. 30; *DeHerrera,* 697 P.2d at 743. The scope of closing argument should not be unduly restricted due to the nature of our adversarial system. *People v. Lundy,* 188 Colo. 194, 197, 533 P.2d 920, 922 (1975). Advocates must be able to present their best case to achieve just results. For this reason, a prosecutor has wide latitude in the language and presentation style used to obtain justice. *See id.* at 198, 533 P.2d 920.

Even in light of the wide latitude given for oral arguments, arguments and rhetorical flourishes must stay within the ethical boundaries drawn by this court. *See id.; see generally Harris,* 888 P.2d at 264 (listing instances when arguments strayed

---

**2.** Specifically, we granted certiorari on the following issue:

Whether the prosecutor's closing argument, in which she repeatedly stated [among other things] that Mr. Domingo–Gomez and other defense witnesses lied, testified untruthfully and/or made up their stories, violated Mr. Domingo–Gomez' constitutional right to a fair trial by an impartial jury.

outside of the ethical boundaries). Closing argument can never be used to mislead or unduly influence the jury. ABA Standards for Criminal Justice § 3–5.8 (3d ed.1993) [hereinafter "ABA Standards"]. Expressions of personal opinion, personal knowledge, or inflammatory comments violate these ethical standards. We have previously stated that expressions of personal belief as to the guilt of the defendant by the prosecutor are improper. *People v. Mason*, 643 P.2d 745, 752 (Colo.1982). Similarly, a prosecutor cannot communicate her opinion on the truth or falsity of witness testimony during final argument, *Wilson*, 743 P.2d at 419, nor should a prosecutor intimate that she has personal knowledge of evidence unknown to the jury, *see Young*, 470 U.S. at 18, 105 S.Ct. 1038. The prosecutor must also avoid "arguments calculated to appeal to prejudices or to mislead the jury" in their deliberations. *Mason*, 643 P.2d at 752. These standards apply with equal force to both the prosecution and the defense. *Young*, 470 U.S. at 8–9, 105 S.Ct. 1038.

The Colorado Rules of Professional Conduct (C.R.P.C.) adopted by this court and the ABA Standards also require that counsel avoid statements of personal opinion, personal knowledge, or inflammatory comments. C.R.P.C. Rule 3.4(e) requires that counsel not "state a personal opinion as to the justness of a cause, the credibility of a witness ... or the guilt or innocence of an accused." ABA Standards section 3–5.8 also embodies these standards:

(a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

(b) The *prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt* of the defendant.

(c) The prosecutor should *not make arguments calculated to appeal to the prejudices of the jury.*

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.

(Emphasis added.) Our prior precedent and the ethical principles embodied in the C.R.C.P. and the ABA Standards require that the prosecution avoid statements related to personal opinion, knowledge personal to the prosecutor, and statements meant to inflame the passions of the jury.

 Prosecutors have a higher ethical responsibility than other lawyers because of their dual role as both the sovereign's representative in the courtroom and as advocates for justice. *People v. Pautler*, 35 P.3d 571, 579 (Colo.O.P.D.J.2001) (citing *People v. Reichman*, 819 P.2d 1035, 1038 (Colo.1991)). Because the prosecutor represents the State and the People of Colorado, their "argument is likely to have significant persuasive force with the jury." ABA Standards § 3–5.8, cmt. For that reason, the possibility that the jury will give greater weight to the prosecutor's arguments because of the prestige associated with the office and the presumed fact-finding capabilities available to the office is a matter of special concern. *Wilson*, 743 P.2d at 419 n. 7 (quoting ABA Standards § 3–5.8, cmt. at § 3.88 (2d ed.1980) ). "Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88, 55 S.Ct. 629. The prosecutor must therefore scrupulously avoid comments that could mislead or prejudice the jury. The prosecutor's actions during a criminal trial must always comport with the sovereign's goal that justice be done in every case and not necessarily that the prosecution "win." *Harris*, 888 P.2d at 263 (citing *Wilson*, 743 P.2d at 418); *People v. Elliston*, 181 Colo. 118, 126, 508 P.2d 379, 383 (1973).

 The trial court is the primary enforcer of these standards. *See Harris*, 888 P.2d at 265. Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion. *Id.* Any improper argument by either counsel must be dealt with promptly by the trial court. *Young*, 470 U.S. at 9, 105 S.Ct. 1038. After hearing the closing arguments of both advocates, the trial court is best positioned to evaluate whether any statements made by counsel affected the jury's verdict. *People v.*

*Gutierrez,* 622 P.2d 547, 554 (Colo.1981). The trial court has the initial responsibility to determine if the prosecutorial misconduct influenced the jury's verdict or otherwise undermined the fundamental fairness of the proceedings. *Harris,* 888 P.2d at 266. An appellate court, however, can review counsel's arguments to avoid a miscarriage of justice notwithstanding the trial court's failure or refusal to do so. *Id.* at 265.

### B.

▆▆▆▆ As we have previously explained, prosecutorial remarks that evidence personal opinion, personal knowledge, or inflame the passions of the jury are improper. Factors to consider when determining the propriety of statements include the language used, the context in which the statements were made, and the strength of the evidence supporting the conviction. *See generally Gutierrez,* 622 P.2d at 554. "The context in which challenged prosecutorial remarks are made is significant, including the nature of the alleged offenses and the asserted defenses, the issues to be determined, the evidence in the case, and the point in the proceedings at which the remarks were made." *Harris,* 888 P.2d at 266.

In light of these standards, we first consider the prosecutor's references to defense witnesses and Domingo–Gomez as having lied. We then individually review whether the prosecutor's two comments that the defendant and his witnesses were "not tell[ing] the truth" and made up their stories were improper statements of personal opinion. Next, we review the propriety of the prosecution's statement implying that the prosecutor's office engaged in a "screening process" and the evidence in this case was sufficient to pass that process.

### 1.

During closing argument, the prosecutor commented that the defense witnesses lied: "His friends *lied* to you. Think about the way that they testified." (Emphasis added.) The prosecutor then declared that Domingo–Gomez lied when he took the stand:

> This defendant says that Mr. Toledo dropped him off at Mr. Menchaca's, left

while it was still dark outside. They didn't get their stories together. Mr. Menchaca and Mr. Toledo didn't even know when this happened. What they are talking about could have happened sometime completely different. Completely different.

> Ladies and gentlemen, this defendant stood before you, sat here and *lied* to you. He did not tell you the truth.

(Emphasis added.) At that point, the trial court sustained its objection to the use of the word "lied" and instructed the jury to disregard any statements made regarding that word. The prosecutor did not use the word "lied" again.

Some words or analogies by their very nature resonate more powerfully in the heart and minds of the jury. They evoke strong reactions in jurors and take them down the path towards a conviction where the evidence does not necessarily lead. The word "lie" is such a strong expression that it necessarily reflects the personal opinion of the speaker. When spoken by the State's representative in the courtroom, the word "lie" has the dangerous potential of swaying the jury from their duty to determine the accused's guilt or innocence on the evidence properly presented at trial. *See Hughes v. State,* 437 A.2d 559, 571 (Del.1981) (" '[L]iar' ... is a flashboard more likely to create heat in a contentious courtroom than it is to illuminate the search for truth.").

▆▆▆ Thus, "[i]t is improper for a lawyer to assert his opinion that a witness is lying. He can argue to the jury that they should not believe a witness, but he should not call him a liar." *State v. Locklear,* 294 N.C. 210, 217, 241 S.E.2d 65, 70 (1978) (internal quotations omitted) (citing *State v. Miller,* 271 N.C. 646, 659, 157 S.E.2d 335, 345 (1967)); *see also Commonwealth v. Balazick,* 278 Pa.Super. 17, 419 A.2d 1333, 1334 (1980); *Commonwealth v. Kuebler,* 484 Pa. 358, 399 A.2d 116, 119 (1979) (Calling the defendant's testimony a "big lie" "attacks the credibility of 'everything' [the defendant] stated on the witness stand, and unequivocally communicates the prosecuting attorney's personal view of appellant's testimony.").

Because the use of the word "lie" to describe witness testimony is an improper statement of personal opinion, the trial court correctly interrupted the prosecutor's argument to sustain the judge's own objection to the use of the word "lied" and instructed the jury to ignore counsel's argument.[3]

**2.**

■ After being admonished by the judge for using the word "lied," the prosecutor rephrased her argument to state: *"[Domingo–Gomez] did not tell you the truth.* He sat there and *did not tell you the truth* about going back to that house and throwing that [M]olotov cocktail. *He was not truthful with you."* (Emphasis added.)

■ While we disapprove of this language as suggestive of personal opinion, unlike the use of the word "lied," they do not have the same degree of rhetorical power to necessarily imply that they are the personal opinion of the prosecutor. We review comments that potentially expose the prosecutor's personal opinion on the veracity of witness statements in the context of the argument to determine whether they improperly express personal opinion. *See People v. Salyer,* 80 P.3d 831, 839 (Colo.App.2003).

■ In cases that turn on the credibility of witness testimony, the line between argument about whether the jury can rely on the testimony of witnesses and improper expressions of personal opinion becomes hard to draw. While we have repeatedly held that advocates may point to evidence that undercuts a witness' testimony, we have never dictated the exact language counsel must use. *See DeHerrera,* 697 P.2d at 743. We refuse to do so now. Instead, we merely note that counsel may properly argue from reasonable inferences anchored in the facts in evidence about the truthfulness of a witness' testimony. Whether a statement improperly expresses the personal opinion of a prosecutor or is an acceptable comment on the credibility of witnesses, requires a reviewing court to consider the language used, the context in which the statement was made, and any other relevant factors.

The prosecutor's comments were an inartful but earnest attempt to comply with the court's direction. They came while the prosecutor recounted the defense's theory of the events and pointed to inconsistencies in the testimony. For example, immediately after her remark, the prosecutor illustrated conflicting testimony about Domingo–Gomez' fight with Paul Baldizan. The prosecutor noted that defense counsel said in his opening statement that Domingo–Gomez lost consciousness after the fight and that his friend had to pull him into the car. The defendant, however, testified that he was losing consciousness. Paul Baldizan offered conflicting testimony that the defendant, to the best of his knowledge, never lost consciousness.

The prosecutor further noted that the alibi witnesses differed on whether Paul Baldizan used a stick, a knife, or some other weapon in the fight with the defendant. Although he did not see any weapons, Domingo–Gomez alleged that he was badly harmed in the fight with Paul Baldizan and that his injuries were consistent with knife wounds. Paul Baldizan, however, testified that he did not have a knife when fighting with Domingo–Gomez and he did not stab the defendant.

The prosecutor's remarks were comments on Domingo–Gomez' credibility in light of Paul Baldizan's directly conflicting testimony about the circumstances of the fight. The facts in evidence supported an inference that Domingo–Gomez' testimony was false. As previously mentioned, counsel can properly comment on reasonable inferences stemming directly from the facts in evidence during closing argument. *See People v. Constant,* 645 P.2d 843, 846 (Colo.1982). While the language used by the prosecutor was susceptible to being considered a personal opinion, upon careful review of the context in which

3. We are aware that two divisions of the court of appeals have applied a test for the appropriateness of referring to defense witnesses' testimony as a "lie" based on a Delaware case. *See, e.g., People v. Dashner,* 77 P.3d 787, 792 (Colo.App. 2003); *People v. Kerber,* 64 P.3d 930, 934 (Colo. App.2002) (citing *Clayton v. State,* 765 A.2d 940, 942–43 (Del.2001)). Because we determine that its use is improper, but does not necessarily warrant reversal, we disapprove of the analysis expressed in these cases.

the prosecutor used these expressions, we do not consider them to have fallen to the level of improper expressions of the prosecutor's personal opinion.

### 3.

 During closing argument, the prosecutor also remarked that:

> If [the Baldizans were] going to make this up, if they had a motive to make this up, all of them would have gotten together and said, "We saw him." Veronica would have said it and so would Paul. She came in here and told you what happened. *They didn't get together on their story like the defendant and his friends.*

(Emphasis added.)

The prosecutor did not anchor her comment that Domingo–Gomez and his alibi witnesses made up their stories with direct references to evidence. After accusing the defense witnesses of collaborating in creating their stories, she stated that "I would ask you to hold this defendant accountable." Without referencing any factual basis, the prosecutor's statement that the defendant and his friends collaborated in creating their stories cannot be considered a comment on a reasonable inference from the evidence. We can only conclude, therefore, that her remark that Domingo–Gomez and his friends made up their stories was an improper statement of personal opinion.

### 4.

 During the rebuttal closing, the prosecutor referred to the "screening process" that Domingo–Gomez' case went through prior to trial. The prosecutor stated:

> Defense counsel says you have to blame someone; why not blame the defendant? He says we're just here because somebody has to be blamed. This isn't like the hypothetical that [the defense attorney] brought up during jury selection where

somebody is walking down the hall and a girl says, "She took my purse," and that's it. This is not that type of case. *There is a screening process for charging cases, and it takes a lot more than somebody saying that person did it. It takes the type of evidence that we have here. At least that.* This is not that type of case.

(Emphasis added.)[4] The prosecutor's reference to a "screening process" is improper because it both hints that additional evidence supporting guilt exists and reveals the personal opinion of the prosecutor.

The prosecutor's remark during rebuttal argument that the defendant's case was screened had the potential to convey that the prosecution had additional inculpatory evidence unknown to the jury. Prosecutorial remarks of personal knowledge, combined with the power and prestige inexorably linked with the office may encourage a juror to rely on the prosecution's allegation that unadmitted evidence supports a conviction. *Wilson,* 743 P.2d at 418–19. This danger may be exacerbated by the timing of the prosecution's remarks. Rebuttal closing is the last thing a juror hears from counsel before deliberating, and it is therefore foremost in their thoughts. *See United States v. Carter,* 236 F.3d 777, 788 (6th Cir.2001).

Counsel's remark indicated a biased opinion on the part of the prosecution and the State. The statement suggests that the State engages in a "screening process" to weed out the weaker cases and, implicitly, that the State does not consider this a weak case. Such an assertion improperly presented the jury with the prosecutor's opinion on the guilt of Domingo–Gomez and encouraged them to rely on the prosecutor's judgment instead of their own convictions.

Comments such as these, which express the prosecution's personal opinion or personal knowledge, or remarks that inflame the passions of the jury can tip the scales to-

---

4. During voir dire, the defense attorney asked a potential juror how she would handle the following situation:

> [L]et's say you were walking down the halls in this beautiful building ... and some young lady passes you and said: "That woman stole

my purse," and lo and behold, based upon that accusation, you're arrested, taken to jail, and eventually taken to trial. There was no purse found, only an accusation. Do you believe that rises to the level of beyond a reasonable doubt?

wards an unjust conviction and must be avoided.

Because we have determined that some of the prosecutor's statements were improper expressions of personal opinion, we next review whether they warrant reversal.

### III. Whether Statements Warrant Reversal

 Domingo–Gomez argues that the improper statements of the prosecutor, both individually and in combination, so prejudiced the jury as to mandate the reversal of his conviction. In evaluating his claim, we review the combined prejudicial impact of the prosecutor's improper statements that Domingo–Gomez and his friends lied, made up their stories, and that the case against the accused passed the State's "screening process."

 The trial court sustained its objection to the prosecutor's use of the word "lied." For that reason, we only look to any potential cumulative prejudice from that remark. Defense counsel did not make a contemporaneous objection to either of the prosecutor's remaining improper remarks. We review prosecutorial statements to which no contemporaneous objection was made for plain error. *Harris*, 888 P.2d at 267; *Wilson*, 743 P.2d at 419. Plain error occurs only when an error so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict. *People v. Miller*, 113 P.3d 743, 750 (Colo.2005); *Harris*, 888 P.2d at 267. A reviewing appellate court must inquire into whether the errors seriously affected the fairness or integrity of the trial. *Young*, 470 U.S. at 15, 105 S.Ct. 1038 (citing *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). Only prosecutorial misconduct which is "flagrantly, glaringly, or tremendously improper" warrants reversal. *People v. Avila*, 944 P.2d 673, 676 (Colo.App.1997).

 We must carefully review whether the cumulative effect of the prosecutor's statements so prejudiced the jury's verdict as to affect the fundamental fairness of Domingo–Gomez' trial. Factors to consider include the language used, the context in which the statements were made, and the strength of the evidence supporting the conviction. *See generally, Gutierrez*, 622 P.2d at 554. Comments that were "few in number, momentary in length, and were a very small part of a rather prosaic summation" do not warrant reversal under the plain error standard. *Mason*, 643 P.2d at 753.

The prosecutor's use of the word "lied" does not tip the scales towards an unjust conviction. Immediately after the word's use, the trial court sustained the judge's own objection and directed the jury to disregard any statements made using the word "lied." The trial court's specific instruction given immediately after the counsel's improper argument stands in stark contrast to the general instruction given before jury deliberations that we did not find to have had a curative impact in *Wilson*, 743 P.2d at 420–21. In *Wilson*, the prosecutor made repeated and egregious remarks expressing his personal opinion that the defendant lied and he believed the child victim of a sexual assault.[5] In light of these very improper remarks, we held that a general instruction given before deliberations that reminded the jury that it is solely their duty to evaluate the credibility of witnesses, and not counsel's, was insufficient to eradicate the prejudicial effects of the prosecutor's arguments. *Id.* Unlike the general credibility instruction given in *Wilson*, the instruction given by the trial court responding to the prosecutor's improper use of the word "lied" specifically charged the jury to ignore counsel's improper remarks. We presume the jury followed the trial court's instruction and disregarded the prosecutor's statements. *People v. Dunlap*, 975 P.2d 723,

5. We note that the prejudicial remarks made in *Wilson* were significantly more egregious than those made in the instant case. The prosecutor in *Wilson* alleged that the defendant lied no less than eight times and even accused the defendant of committing perjury. *Wilson*, 743 P.2d at 417. Additionally, the prosecutor claimed the defen- dant and his wife made their testimony up and expressed his personal belief in the veracity of the child victim. *Id.* The trial court failed to give a specific instruction to jury to ignore these improper remarks and the prosecutor's reprehensible statements permeated the entire closing argument. *Id.* at 418.

744 (Colo.1999). Were we to presume that the jury instead ignored the trial court's remedial instruction we would deprive that court of its ability to correct improper argument as it occurs. Such a result would deprive the trial court of the ability to prevent a mistrial caused by counsel's improper remarks.

Furthermore, both the prosecution and the defense attorney reminded the jury to rely on their own collective memories and not the arguments of counsel, because counsel's arguments were not evidence. Unlike the general credibility instruction in *Wilson*, which we found unpersuasive, this reminder came directly from both attorneys during their closing arguments. Here, the People threw the weight inherent in the prosecutor's office into warning the jury to ignore her arguments and make their own credibility determinations. In asking the jury not to rely on her arguments, the prosecutor was both distancing her office from her remarks and asking the jury to ignore her personal opinions, thereby refuting any notion that she was asking the jury to put any weight in her personal opinions.

When alleging that Domingo–Gomez and other alibi witnesses made up their stories, the prosecutor used weaker language than the language prohibited by the trial judge. She further made the statement while attempting to comply with the trial court's prohibition on using the word "lied." In this context, the prejudicial effect of her statements was sufficiently alleviated.

The prosecutor's statement that Domingo–Gomez' case passed a state "screening process," while improper, was also delivered in a context that alleviated its prejudicial impact. The prosecutor commented that "it takes a lot more than somebody saying that person did it. It takes the type of evidence that we have here." Her comment refuted the defense attorney's remark in voir dire suggesting that this case consisted entirely of an unsupported accusation, by reminding the jury that the evidence against Domingo–Gomez was not limited to Stephanie Baldizan's eye witness account. The jury saw and heard other evidence of guilt, including Domingo–Gomez' comment to the police during

arrest, his motive to seek revenge after losing the fight with Paul Baldizan, and inconsistencies in the alibi witnesses' testimony.

The prejudicial effect of the remark is also lessened by the prosecutor's admission that "[a]t least" the amount of evidence offered against Domingo–Gomez was required to pass the State's process. The prosecutor's statement acknowledged that the State's case was weak, perhaps including only the minimum amount of evidence necessary to pass the State's "screening process." This admission alleviates the prejudicial impact of the prosecutor's "screening process" remarks because it runs contrary to ·the assertion that additional evidence supporting guilt was known to the prosecutor.

■ Furthermore, defense counsel did not make a contemporaneous objection to either comment. A reviewing court can consider the lack of an objection when evaluating the impact of a prosecutor's argument. "The lack of an objection may demonstrate the defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." *Rodriguez,* 794 P.2d at 972 (citing *Brooks v. Kemp,* 762 F.2d 1383, 1397 n. 19 (11th Cir.1985) (en banc), *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated,* 809 F.2d 700 (11th Cir.1987)).

The prosecutor's statements that Domingo–Gomez and other defense witnesses lied and made up their stories, in conjunction with the prosecutor's comment that the defendant's case passed the State's "screening process," were improper and cannot be condoned. Several mitigating factors, however, exist. The trial court eradicated the prejudicial effect of the prosecutor's use of the word "lied" by sustaining the judge's own objection to the word's use. The prosecutor's use of weaker language in making her other improper remarks and the context in which she referred to the State's "screening process" alleviated much of its prejudicial effect. The defense counsel's failure to make a contemporaneous objection to the prosecutor's remarks evidences that he perceived no obvious prejudice to Domingo–Gomez. Viewing the prosecutor's arguments in the context of the entire trial, including the trial court's

attempt to address the problem, the prosecutor's attempt to comply, and the lack of any reaction from the defense, we conclude that the statements did not undermine the fundamental fairness of the trial and cast serious doubt on the reliability of the jury's verdict. Thus, the prosecutor's conduct in this case does not warrant the drastic remedy of reversal under the plain error standard.

## IV. Conclusion

We affirm the judgment of the court of appeals.

Justice BENDER dissents.

Justice BENDER, dissenting.

The majority holds that the prosecutor's conduct in this case, while improper in three of four instances, nonetheless does not warrant reversal of Domingo–Gomez' conviction. In a close case, where the trial outcome rests upon the jury's decision regarding whose testimony to believe and the jury is divided after some deliberation, the prosecutor's argument assumes greater significance than it ordinarily would, and weighs heavily in the jury's decision. Here, the prosecutor's statements of personal opinion telling the jury that the defense witnesses were effectively lying, when combined with her statement of fact implying there existed additional evidence not presented to the jury that assured Domingo–Gomez' guilt, cast doubt on the reliability of the jury's verdict. Although I agree with the majority's discussion of legal principles, I disagree with their application in this case. Hence, I respectfully dissent and would reverse Domingo–Gomez' conviction.

## Discussion

Prosecutors must shoulder weighty responsibilities within our jurisprudential scheme. "Prosecutors, who are enforcers of the law, have higher ethical duties than other lawyers because they are ministers of justice, not just advocates." *People v. Pautler,* 35 P.3d 571, 579 (Colo.O.P.D.J.2001) (citing *People v. Reichman,* 819 P.2d 1035, 1038 (Colo. 1991)). They have a responsibility not only to adhere to our standards of professional conduct, but they should also "strive to ex-

ceed" these standards. *Id.* The prosecutor's enhanced role, which includes the additional duty to uphold our system of justice as a minister of justice, is articulated in the Colorado Rules of Professional Conduct:

> A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.

Colo. RPC 3.8 cmt. [1].

In my view, the majority fails to hold the prosecutor in this case to these high standards.

The majority concludes that the prosecutor's use of the word "lied" during closing, although an improper personal opinion, was cured by a shift in phraseology. Because the prosecutor did not say the word "lied" again, the majority concludes these statements were not unduly prejudicial. I disagree.

While refraining from using the word "lied" again, the prosecutor told the jury the same thing by resorting to the synonymous phrases "did not tell you the truth" and "not truthful." Maj. op. at 1051. I see no difference between saying Domingo–Gomez lied and saying that he didn't tell the truth. The verb "lie" is synonymous with "be untruthful." *Roget's International Thesaurus* 260 (5th ed.1992). The average listener on the jury would not make a substantive distinction between these terms. The prosecutor's use of the phrases "not truthful" and "did not tell you the truth" in place of "lied" constitutes an impermissible commentary on the defendant's credibility. *See, e.g., State v. Elnicki,* 279 Kan. 47, 105 P.3d 1222 (2005) (reversing defendant's conviction for cumulative error that included prosecutor's assertion in closing argument, through use of synonyms, that defendant lied, even though she avoided the word "lie").

The majority asserts that the word "lie" resonates more powerfully than similar words or phrases. Maj. op. at 1050. Yet, this assumption does not change the prejudicial effect that this word, once uttered, had on the jury. Though the trial court issued a

curative instruction to stop using the word "lying," as the prosecutor's argument unfolded, the instruction just reinforced the argument's unfair impact. Substitution of interchangeable terminology does not change the impact on the listener. By rephrasing her statement that Domingo–Gomez "lied" to the assertion that he was "not truthful," the prosecutor was playing a game of semantics and simply exchanging synonymous terms to express the very same idea—that he lied. In the words of the Kansas Supreme Court in *Elnicki*, although she used different terminology, the prosecutor nonetheless told the jury, using thinly disguised semantics, that Domingo–Gomez was lying. *Elnicki*, 105 P.3d at 1233.

To bolster its determination that the prosecutor's use of the word "lied" and synonymous terms do not warrant reversal, the majority's rationale rests in part on the fact that the attorneys on both sides reminded jurors to rely on their memories rather than counsels' arguments to evaluate witness testimony. This rationale contradicts what we said in *Wilson v. People*, a case addressing a situation similar to this one. In *Wilson*, as here, there was no physical evidence tying the defendant to the crime. 743 P.2d 415, 420 (Colo.1987). Accordingly, the outcome hinged upon whether the jury believed the State's witnesses or those for the defense. *Id.* During closing argument, the prosecutor repeatedly stated that the defendant and his witness had lied in their testimony. *Id.* at 417. Though the court subsequently instructed the jury that it was their duty to ascertain the credibility of the witnesses,[1] we nonetheless found plain error. *Id.* at 420–21. We noted that "it would defy common sense . . . to believe that this instruction was sufficient to neutralize the impact of the prosecutor's improper remarks." *Id.* We further explained that, "[a]lthough jurors are obviously aware that the arguments of counsel are not evidence, we cannot ignore the fact that jurors do pay heed to the arguments of counsel in arriving at a result." *Id.* at 421.

This logic undercuts the majority's position that similar admonitions to the jury can override the prejudicial effects of the prosecutor's charge that Domingo–Gomez lied. It may be accurate that the prejudicial remarks at issue in *Wilson* were more egregious than those made in this case. *Maj. op.* at 1053, n. 5. However, the greater degree of impropriety of the statements in *Wilson* does not render the statements in this case any less harmful.

The majority also reasons that the prosecutor made a permissible inference regarding Domingo–Gomez' credibility when she stated that he was not truthful. *Id.* at 1051–1052. Again, I disagree. The ABA Standards, relied upon by the majority, delineate between drawing a reasonable inference based on evidence and expressing an improper personal belief regarding a witness's testimony. *Id.* at 1049. Subsection 3–5.8(a) states that, in closing, a prosecutor may argue reasonable inferences based on the evidence. ABA Standards for Criminal Justice § 3–5.8(a) (3d ed.1993); maj. op. at 1049. However, subsection (b) states that a prosecutor should not express her opinion as to the veracity of witness testimony. ABA Standards for Criminal Justice, *supra*, § 3–5.8(b); maj. op. at 1049. The fact that the two provisions are listed as separate subsections indicates that an opinion regarding witness credibility is different than an argument based upon reasonable inferences.

The commentary to section 3–5.8 supports this distinction. While acknowledging that the "line between permissible and impermissible argument is a thin one," the commentary explicitly states that "[c]redibility is to be determined solely by the triers of fact." *Id.*, cmt. The commentary explains that "an advocate may point to the fact that [evidence] give[s] support to one witness or cast[s] doubt on another." *Id.* The National Prosecution Standards also bolster this rationale, stating that "[w]ith the *exception* of statements of personal belief, the prosecutor may comment unfavorably on witnesses, noting

1. The majority distinguishes *Wilson* from this case by asserting that the instruction in *Wilson* may have been less effective in overriding the prejudicial effects of the prosecutor's remarks because it came from the court instead of from counsel, as in this case. I question this assertion. In my view, an instruction from the court arguably carries more weight with the jury than statements from counsel.

inconsistent accounts ... [and] possible sources of bias." National District Attorneys Association, *National Prosecution Standards* 229 (2d ed.1991) (emphasis added).

The line between highlighting inconsistent testimony and making improper expressions of personal opinion may be difficult to locate, but in this case, the prosecutor went beyond pointing out evidence that undermined Domingo–Gomez' testimony. By informing the jury that Domingo–Gomez was not telling the truth, the prosecutor overtly called him a liar—safely over the line where improper expression of opinion begins. Instead of appropriately pointing out inconsistent testimony and other evidence indicating that Domingo–Gomez may not have been telling the truth, then allowing the jurors to draw their own conclusions, the prosecutor went too far. She gave the jury her opinion, several times, that Domingo–Gomez was lying, not truthful, and not telling the jury the truth. The criteria set forth by the majority to determine whether a statement is an improper expression of personal opinion—the language used and the context in which the statement was made—leads to the conclusion that the prosecutor crossed the line. By stating that Domingo–Gomez was not telling the truth when his credibility was critical to the jury's decision, the prosecutor expressed an improper personal opinion that was highly prejudicial.

The majority concludes that the prosecutor's other two statements in question were improper, but their cumulative effect did not affect the fundamental fairness of Domingo–Gomez' trial. Maj. op. at 1052–1053. I address the remaining two statements in turn.

The majority determines that, though improper, the prosecutor's statement that Domingo–Gomez and his witnesses collaborated to fabricate their stories does not warrant reversal of Domingo–Gomez' conviction. The majority suggests that, because the prosecutor used "weaker language" than the word "lied," the prejudicial effect of her statement was nullified. *Id.* at 1054. For the reasons I set forth above in discussing the prosecutor's use of other synonymous terminology for "lying," I disagree.

Finally, in considering whether the prosecutor's statement during rebuttal that Domingo–Gomez' case passed a "screening process" warranted reversal, the majority holds that the context in which the prosecutor delivered the statement diminished its impact. *Id.* at 1054. Because, as I emphasized above, the prosecutor has a higher ethical responsibility than other lawyers, I reach the opposite conclusion.

The statement that the defendant's case had to pass a "screening process" in order to get to trial creates highly prejudicial implications. Indeed, I find this the most troubling of the four improper statements made by the prosecutor. By announcing this fact to the jurors, the prosecutor generates the impression that there is additional evidence of Domingo–Gomez' guilt that incriminates him and should be considered by them even though this additional evidence was not admitted at trial. A prosecutor's insinuations that "additional inculpatory evidence exists that was not presented at trial ... invite[s] the jury to speculate about such phantom proof, and may be even more prejudicial than erroneously admitted specific proof." Bennett L. Gershman, *Prosecutorial Misconduct* § 11:28, at 496 (2d ed.2005). The prosecutor's multifaceted role as "an administrator of justice, an advocate, and an officer of the court" brings additional credence and weight to this unfair argument. ABA Standards for Criminal Justice, *supra,* § 3–1.2(b). The danger of a miscarriage of justice is especially imminent when there is no physical evidence linking the defendant to the crime. Such an unfair comment undermines the fundamental fairness of an accused's trial.

The majority reasons that this "screening" remark's prejudicial impact was lessened by the prosecutor's acknowledgement "that the State's case was weak, perhaps including only the minimum amount of evidence necessary to pass the 'screening process.'" Maj. op. at 1054. I reach the polar opposite conclusion. The prosecutor told the jury that, because of the screening process, this case was not like a case where there is only one witness who said he did it.[2] The prosecutor told

2. In fact, there was only one witness who placed Domingo–Gomez at the crime scene.

the jury that "there is a screening process for charging cases, and it takes a lot more than somebody saying that the person did it. It takes the evidence that we have here. At least that."

In my view, the prosecutor was saying that this was *not* a weak case—that it was, in fact, a strong case—because enough evidence existed to support Domingo–Gomez' guilt for the case to pass the "screening process." Put another way, this comment effectively told the jury that the evidence the jury heard, when combined with the other evidence presented in the screening process, established a strong case. The prosecutor's use of the phrase "at least that" does not indicate the evidence against Domingo–Gomez was minimal, as the majority contends. Rather, it implies the State possessed even more evidence than it presented at trial.

Consideration of the unduly prejudicial statements in isolation is inappropriate to determine plain error. Rather, the cumulative prejudicial impact of these statements conclusively establishes a serious and substantive impropriety to the extent that Domingo–Gomez' trial cannot be said to have been fair. I suggest that we should not speculate as to why defense counsel failed to object. Possibly, it may have been due to a mistake on counsel's part. Hence, I would not assume that defense counsel's silence indicated that the prosecutorial misconduct here was not prejudicial.

The jury's actions support the conclusion that the prosecutor's misconduct precluded Domingo–Gomez from receiving a fair trial. *See Wilson,* 743 P.2d at 420. Their request to review witness transcripts and their subsequent difficulty in reaching a verdict suggest that, in a close case such as this, where the outcome turns on witness credibility rather than physical evidence, the prosecutor's improprieties—opining that key witnesses lied and implying that extra inculpatory evidence existed—unduly influenced their deliberations and thwarted our system's guarantee of a fair trial.