22CA1594 Peo v Boerner 01-22-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1594
Adams County District Court No. 20CR3432
Honorable Roberto Ramírez, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Daniel Michael Boerner,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE JOHNSON
Harris and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 22, 2026

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jason C. Middleton, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Daniel Michael Boerner (Boerner), appeals the judgment of conviction entered on a jury verdict finding him guilty of two counts of sexual assault on a child as to his daughter, L.B. (daughter), and as to a family friend, I.L. (family friend); two counts of sexual assault on a child — position of trust as to the daughter and family friend; and one count of aggravated incest.  The jury also made a special finding that the sexual assault on a child as to the family friend was part of a pattern of abuse.  Boerner alleges that the district court erred by (1) allowing the jury unfettered access to the victims' forensic interviews during deliberations; (2) allowing the prosecutor to engage in misconduct; and (3) admitting improper testimony related to the detective's "screening" of cases, Boerner's arrest warrant, and references to department of human services cases.  He also contends that there was insufficient evidence to support the convictions related to the daughter and raises a claim of cumulative error.

¶ 2     We agree that the court erred by allowing the prosecutor to engage in misconduct and that the error was obvious and substantial, warranting reversal.  We conclude, however, that there was sufficient evidence as to the convictions relating to the

daughter, so Boerner can be retried on those counts.  Therefore, we reverse and remand for a new trial.  In light of our disposition, we do not address Boerner's other contentions because they are not likely to arise on remand in the same manner.

## I.  Background

¶ 3    The prosecutor presented the following evidence upon which the jury found Boerner guilty.

¶ 4    The family friend, who was ten years old at the time, and her family attended a gathering at the house where Boerner and his family lived.  The family friend was friends with Boerner's daughter, who was also ten years old at the time.  The family friend thought of Boerner as an uncle or a "second dad."  At one point, while the family friend and the daughter were in the hot tub at the residence, the family friend's bathing suit bottom "started to come undone," and Boerner offered to retie it.  The family friend testified that Boerner tied her swimsuit and then put his hand "inside the bottom of [her] bathing suit" and touched her vagina.

¶ 5    Later that evening, the daughter and the family friend were watching videos in the daughter's bedroom, sharing the bottom bunk.  Boerner entered the bedroom and spoke to his daughter

about their plans for the next day.  The family friend said that while Boerner was talking to his daughter, he reached inside the family friend's shorts and touched her vagina.  Boerner eventually left the room, and the family friend locked the door and started crying.  She chose not to tell her parents about what happened because she "was scared they wouldn't believe [her]."

¶ 6    After the family friend disclosed the sexual assaults to a school counselor, Safe2Tell Colorado interviewed her, the daughter, and S.W., the daughter's half sister (stepdaughter) at their respective homes.  Caseworkers from the Adams County Department of Human Services (the Department) later conducted forensic interviews with the three girls.  During the daughter's forensic interview, she said that she saw Boerner reach inside the family friend's shorts and that the family friend had told her and the stepdaughter about the assault.  When the interviewer asked whether Boerner had done a similar act to someone in the family, the daughter disclosed that he had touched her vagina years earlier.  During the stepdaughter's forensic interview, she said that the family friend told her about the assault in the bedroom after it

happened, and she was crying and "freaking out" about it, but the stepdaughter said that she did not believe the accusation.

¶ 7    The daughter's and stepdaughter's testimony at trial differed substantially from their statements during the forensic interviews, directly or partially contradicting their earlier corroborations of the family friend's account. The daughter testified that, contrary to what she had said during the forensic interview, she did not think Boerner had ever touched her inappropriately, and she did not remember telling the interviewer that he had. She testified that she remembered telling the forensic interviewer that Boerner touched the family friend "multiple times," but she did not think that was what happened and that "nothing happened that night." The stepdaughter testified that she did not believe the family friend's allegation, which she said she told the forensic interviewer. The family friend testified, consistent with her forensic interview, that Boerner had touched her vagina in the hot tub and in the daughter's bedroom.

¶ 8    Boerner testified in his defense. He denied touching either girl inappropriately but acknowledged fixing the family friend's swimsuit in the hot tub.

4

¶ 9      The jury convicted Boerner of all charges.  The district court sentenced him to an indeterminate term of ten years to life in the custody of the Department of Corrections.

## II.      Prosecutorial Misconduct

¶ 10      Boerner argues that the prosecutor improperly asked him to opine on the veracity of the other witnesses' testimony.  We agree.

## A.      Additional Facts

¶ 11      Throughout Boerner's cross-examination, the prosecutor asked him to opine on the truthfulness of other witnesses' testimony.  At times, the prosecutor asked Boerner to opine on whether the family friend or daughter had made up the allegations of sexual assault:

> Q: So to the best of your knowledge, [the family friend] decided in that hot tub that I'm going to make up a sexual assault allegation against my third dad?
>
> A: I'm not able to speculate what she was thinking.

¶ 12      The prosecutor also asked Boerner questions about which statements from the daughter's forensic interview were true or false:

> Q: Do you believe the information that your daughter . . . gave to the forensic interviewer was *false*?

A: Which information?

Q: Do you believe any of it was false?

A: *I believe some of it was false, yes.*

Q: What parts do *you believe were false* from your daughter's testimony to the forensic interviewer?

A: That's a 56-minute interview, sir. There's a lot of parts to it.

Q: Hit me with the highlights.

A: The part about me touching her is absolutely false. The parts of where she says that she saw me touching [the family friend] are absolutely false. There's not any possible way she would have been able to see that if it had even occurred. Her not wearing dresses is false. That girl loves dresses, and I'm pretty sure she wore one here yesterday. I think that's most [of the] highlights.

Q: Okay. So the part about you guys having a barbecue was true?

A: That's correct.

Q: The part about her and [the family friend] in hot tub was true?

A: That's correct.

Q: The part about her and [the family friend] changing into your clothes was true?

A: That's correct.

Q: The part about her and [the family friend] going to bed in her bedroom was true?

A: That's correct.

Q: The part about you going into the bedroom late at night was true?

A: That's correct.

Q: The part about them waking up the next morning for Mother's Day was true?

A: Yes.

Q: So the only parts in your mind that are *untrue* are very specific to when those kids start describing sexual assaults; is that right?

A: That's correct.

. . . .

Q: So every single detail that you heard in that interview is correct except for the part where they allege that you touch them?

A: I wouldn't say every single detail, no. I would say on the highlights, so your major bullet points. But all the little nuanced details, I have five pages of notes on that particular interview alone of things that are incorrect in that interview.

Q: So do you want to list for us any of the other details that you think are important for us to know *that you think are untrue*?

¶ 13    (Emphases added).  Boerner then had a colloquy with the prosecutor about all the details from the daughter's forensic interview that he opined were untrue.

¶ 14    Subsequently, the prosecutor asked Boerner to opine as to whether the daughter and family friend fabricated the allegations of sexual contact:

> Q: And so for what you're telling us to be true, those ten-year-old girls would have had to weave in sexual assault allegations perfectly into a story that is, as you just described, mostly true; is that right?
>
> A: I wouldn't say perfectly but they did.

¶ 15    Boerner testified about the differing versions of the events told by the family friend and daughter in their forensic interviews conducted by the Department and by school officials as part of the Safe2Tell interview, as compared to the children's in-court testimony.  The prosecutor then asked Boerner, "So advise us, which version should we believe?"

¶ 16    The prosecutor also asked Boerner to opine as to whether the stepdaughter's forensic interview statements or her in-court testimony were truthful:

Q: So [the stepdaughter's] statement in court was *untruthful*?

A: I'm not able to speculate on that. I don't know. I wasn't in that room.

Q: I thought you were in the room?

A: In her bedroom when [the family friend] woke up, no.

Q: So when you were in the bedroom, [the family friend] was asleep?

A: So I believe we're talking about two different times here. If we're not, I might be confused and please straighten me out if I'm wrong here. My understanding is that when [the stepdaughter] — what she testified to in her forensic interview is that she was — that she was woken up by [the family friend] crying at some point in time through the night, which I was not there for. I was not there when the girls woke up in the morning. At no point in time was I in the room outside of when I told them to go to bed and turn off the movie.

. . . .

Q: Okay. Do you believe any of the information that [the stepdaughter] discloses to the forensic interviewer was *false*?

A: I'm trying to review her video in my head and my notes from that one. Yes, some of the information she gave was false.

Q: Anything that pertains to what happened in the bedroom?

9

A: No. Not that I'm not aware of.

. . . .

Q: So should we rely on what they [the children] told the forensic interviewers two years ago?

A: Only if you rely on what they said before that as well.

¶ 17    (Emphases added.)

B.    Standard of Review and Applicable Law

¶ 18    In reviewing claims of prosecutorial misconduct, we first evaluate whether the challenged conduct was "improper based on the totality of the circumstances." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). Second, we look at whether such actions warrant reversal according to the proper standard of review. *Id.*

¶ 19    Defense counsel did not object to any of these questions; therefore, we review for plain error. Plain error is error that is both obvious and substantial. *Hagos v. People*, 2012 CO 63, ¶ 18. An error is obvious when it contravenes a well-settled legal principle and is substantial when it "so undermine[s] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Robinson*, 2019 CO 102, ¶¶ 19, 29.

10

## C.    Analysis

¶ 20    We conclude that the court allowed the prosecutor to engage in misconduct and that the error was obvious and substantial, requiring reversal.

¶ 21    For an error to be obvious, it must "ordinarily contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law." *People v. Kessler*, 2018 COA 60, ¶ 45. Nearly twenty years ago, *Liggett v. People* held that "were they lying" types of questions are categorically impermissible. 135 P.3d 725, 733 (Colo. 2006).

¶ 22    This has developed into a well-settled categorical rule that it is improper for a prosecutor to ask a testifying defendant to opine on the veracity of another witness, as such questioning offers little or no probative value, ignores the many alternative explanations for evidentiary discrepancies, infringes upon the province of the fact finder, and is argumentative. *Id.* at 731-32. This prohibition applies to questions asking whether a witness's testimony was true or untrue, incorrect, or "made up." *Kessler*, ¶¶ 42, 46; *see People v. Koper*, 2018 COA 137, ¶¶ 31-32, 35-37.

¶ 23     Given this well-settled case law, the prosecutor engaged in obvious misconduct when he asked Boerner to opine as to which parts of the testimony of his daughter, stepdaughter, and the family friend were true or untrue. These questions, peppered throughout Boerner's cross-examination, amounted to categorically impermissible "were they lying" type questions. *Liggett*, 135 P.3d at 733; *see Koper*, ¶ 30. And given the pervasive number of prohibited questions asked by the prosecutor, the district court should have applied *Liggett* to prevent the prosecutor from phrasing his inquiries in the manner he did.

¶ 24     While the Attorney General argues that Boerner opened the door to these questions, he did not testify as to the veracity of other witnesses during his direct examination. *See Koper*, ¶ 39.

¶ 25     Likewise, we disagree with the Attorney General's attempt to distinguish the prosecutor's questions from prohibited "are they lying" type questions. The questions need not specifically refer to "lying"; the crucial point is whether the question seeks to elicit an opinion from the witness that another witness is or is not telling the truth. And "[o]ne of the reasons the *Liggett* court disapproved of "are they lying" questions is that a direct comment on a person's

12

truthfulness "seeks information beyond the witness's competence." *People v. Lopez*, 2024 COA 26, ¶ 27 (quoting *Liggett*, 135 P3d at 731) (*cert. granted* Dec. 23, 2024).

¶ 26    Next, we conclude that the error was substantial. An error is substantial if it "undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Koper*, ¶ 43 (quoting *Hagos*, ¶ 14). We reach this conclusion for four reasons.

¶ 27    First, the prosecutor's questions while cross-examining Boerner were not limited to a peripheral issue. Rather, the questions went to the core issue in the case: the credibility of the daughter's allegations that Boerner had sexually assaulted her and the family friend and the credibility of the stepdaughter's initial statements concerning the family friend's assault. *Cf. Liggett*, 135 P.3d at 735 (Questions about whether witness was "mistaken" were not plainly erroneous when "the subject matter of the questions was largely peripheral to issues before the court.").

¶ 28    This is especially true when two of the witnesses — the daughter and stepdaughter — recanted their forensic interview statements at trial. Asking Boerner to opine on whether the

children's in-court or forensic interview statements were true or false went to the very issue of which version of the daughter's and stepdaughter's accounts the jury should believe.

¶ 29 Second, the evidence against Boerner was not overwhelming. *Cf. id.* at 734 (The questions were harmless error because "the trial court had ample evidence to support Liggett's convictions and did not accord weight to the improper statements."). No physical evidence was admitted at trial, and, as we have already mentioned, the daughter's and stepdaughter's trial testimony contradicted their earlier forensic interview statements, and both girls testified inconsistently with the family friend's recollection of the assault perpetrated against her.

¶ 30 Third, the prosecutor recognized that the case hinged on the jury believing the family friend, as well as the daughter's and stepdaughter's prior statements, and disbelieving the daughter's and stepdaughter's in-court testimony. During closing argument, the prosecutor said that Boerner had admitted to all elements of the sexual assault offenses except for engaging in sexual contact with his daughter or the family friend. The prosecutor continued that when the jury goes to deliberate, "it's all going to come down to one

14

thing, and that's credibility." The prosecutor highlighted the differences between the daughter's and stepdaughter's testimony from the forensic interviews to their in-court testimony, saying, "Even though they're children, you still assess their credibility."

¶ 31     And finally, the facts here — asking Boerner whether his daughter and the family friend were being "untruthful," whether the children "made up" the allegations, and whether the children's statements were "false" — rendered the already improper questions especially prejudicial. In effect, these questions placed him in the "no-win situation" *Liggett* warned against: Boerner had to choose between calling two young girls liars or testifying that they were not lying, implying that he was lying. *Koper*, ¶ 45 (quoting *Liggett*, 135 P.3d at 732). And in fact, there are several instances when he did testify in response to the prosecutor's questions that some of the statements made by his stepdaughter and daughter in their forensic interviews were false.

¶ 32     Thus, the error undermines our confidence in the reliability of the judgment of conviction, as this was the type of "flagrantly, glaringly, or tremendously improper" conduct that warrants reversal. *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo.

15

2005) (citation omitted). We therefore conclude that the prosecutorial misconduct here requires reversal of Boerner's judgment of conviction. And because we reverse on this issue, we do not reach his other claims of prosecutorial misconduct.

### III. Sufficiency of the Evidence

¶ 33 Boerner contends that there was insufficient evidence to convict him of the charges relating to the daughter. We disagree.

### A. Standard of Review and Applicable Law

¶ 34 We review the record de novo "to determine whether the evidence presented was sufficient in both quantity and quality to sustain a defendant's conviction." *McCoy v. People*, 2019 CO 44, ¶ 63.

¶ 35 The question is "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010) (citation omitted). "A conviction will not be set aside merely 'because a different conclusion might be drawn from the evidence.'" *People v. Oliver*, 2020 COA 150, ¶6 (citation

omitted).  We must give the prosecution "the benefit of every reasonable inference which may be fairly drawn from the evidence." *Clark*, 232 P.3d at 1292.  If the evidence is "such that reasonable jurors must necessarily have a reasonable doubt, then the evidence is insufficient to sustain the defendant's conviction." *Id.*

### B.  Analysis

¶ 36 Boerner contends that, because the only evidence that supported a conviction on the charges relating to the daughter was his daughter's unsworn — and later repudiated — statement during a forensic interview, there was insufficient evidence to support the two convictions related to the daughter.  He argues this evidence was not substantial and sufficient, as the daughter's forensic interview statement was contradicted by her trial testimony, her interview with Safe2Tell, and her statement to her mother.

¶ 37 He points to Florida cases holding that prior out-of-court statements by alleged child victims that are repudiated or unsupported by the child's trial testimony are insufficient to support a conviction absent corroborating evidence.  *See, e.g.,* *Baugh v. State*, 961 So. 2d 198, 205 (Fla. 2007); *Beber v. State*, 887 So. 2d 1248, 1253 (Fla. 2004).  But Boerner does not cite, and we

17

are not aware of, any Colorado authority reaching this same conclusion. And we decline to endorse such a sweeping rule given that "[s]kepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon." *People v. Schneider*, 25 P.3d 755, 763 (Colo. 2001).

¶ 38 The lack of physical evidence presented at trial meant this case turned on the credibility of those who testified. And it is well established that credibility determinations are a "matter solely within the province of the jury." *People v. Franklin*, 645 P.2d 1, 4 (Colo. 1982). An "important reason for entrusting determination of these critical issues to a jury is to obtain the benefit of the wisdom and diverse human experience of the several jurors in evaluating whether a witness is believable." *Id.* at 5. Unlike jurors, appellate courts are ill-suited to make the credibility determinations "essential to a determination of guilt or innocence." *Id.* And, viewing the evidence in the light most favorable to the prosecution, it is plausible that the jury credited the statements from the daughter's forensic interview and discredited her in-court testimony and other statements contradicting them.

¶ 39    Regardless, we do not read the daughter's in-court testimony to be a complete repudiation of her allegation of sexual contact. She testified that she did not think her father had touched her and did not remember making such an allegation to the forensic interviewer. This is quite different, though, from a witness's in-court testimony that unequivocally states that the charged conduct did not occur at all.

¶ 40    Therefore, we conclude that the evidence was sufficient to support the sexual assault and incest convictions relating to the daughter.

IV.    Conclusion

¶ 41    We reverse the judgment of conviction and remand the case to the district court for a new trial.

JUDGE HARRIS and JUDGE SCHOCK concur.