23CA1124 Peo v Underwood 10-23-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1124
El Paso County District Court No. 21CR3392
Honorable Marcus S. Henson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Derek Wayne Underwood,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Freyre and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 23, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emma Berry, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Derek Wayne Underwood appeals the judgment of conviction entered after a jury found him guilty of second degree assault with a deadly weapon.  He contends that the trial court (1) abused its discretion by denying his challenge for cause against a juror who expressed a bias in favor of law enforcement; (2) plainly erred by allowing a police officer to testify about statements the victim made; and (3) plainly erred by allowing the prosecutor to make improper statements during closing argument.  He also contends that the cumulative effect of these errors mandates reversal.  We affirm the judgment.

## I.    Background

¶ 2    In 2021, Underwood and the victim were coworkers at a pottery shop in Manitou Springs.  After learning that Underwood did not have a place to live, the victim offered to let him stay in the walk-in closet of his studio apartment, and Underwood accepted.  One evening, shortly after the victim returned home from work, he and Underwood got into an argument.  The argument escalated into a physical altercation, during which Underwood cut the victim's

hand with a chef's knife. The victim fled the apartment and asked someone to call the police.

¶ 3    The victim told responding police officers that Underwood had stabbed him in the hand after he told Underwood to calm down. Later, while being treated at the hospital, the victim told an officer that Underwood had started the argument that led to the stabbing because Underwood was annoyed that the victim wanted him to return a borrowed cell phone.

¶ 4    When officers entered the victim's apartment, they found Underwood packing a bag and "in a hurry to get out of there." In a later police interview, Underwood told an officer that the victim came home from work and "seemed upset" and "freak[ed] out" over a woman named Amy who "doesn't like him." Underwood said he tried to calm the victim down, but the victim responded with a "condescending tone." When Underwood told the victim not to speak to him that way, the victim came toward Underwood with his fists balled and his chest puffed out before grabbing a large piece of "slag," a byproduct of smelting ore. Underwood claimed that the

2

victim swung a bottle of laundry detergent at him and threw things at him before leaving the apartment to call the police.

¶ 5 Underwood denied knowing how the victim's hand was cut but suggested that perhaps the slag caused the injury because it was sharp. But when a police officer searched the victim's apartment, he did not find any slag; instead, he found a chef's knife hidden in the toilet's tank. The officer did, however, find a bottle of laundry detergent with blood on the handle.

¶ 6 As Underwood was escorted to booking after the interview, he remarked that he wished he had killed the victim and muttered that "dead men tell no tales."

¶ 7 The People charged Underwood with first degree assault, second degree assault — serious bodily injury, and felony menacing. At trial, Underwood, through defense counsel, admitted to stabbing the victim with a chef's knife but claimed that he did so in self-defense after being attacked by the victim, who was much larger and "militarily trained."

¶ 8 The jury rejected Underwood's theory of self-defense and found him guilty of second degree assault with a deadly weapon as a lesser included offense of first degree assault. However, the jury

determined that Underwood did not cause serious bodily injury to the victim, and it acquitted Underwood of the first degree assault, second degree assault — serious bodily injury, and menacing charges.

## II.    Denial of Challenge for Cause

¶ 9    Underwood first contends that the trial court reversibly erred by denying his challenge for cause against Juror S.  We are not persuaded.

### A.    Additional Background

¶ 10    During voir dire, the prosecutor and Juror S had the following exchange:

> [THE PROSECUTOR]: [I]t sounds like you know some people that have worked in law enforcement.  And so my question is, would you judge a law enforcement officer that testifies any differently than you would anyone else that testifies?  Because you're the judge of credibility.  So would you judge their credibility like you would anyone else?
>
> [JUROR S]: Yes, I would say I would.  I would judge and listen to someone on law enforcement and have — because of their position, they would be more credible than maybe someone outside the law.
>
> [THE PROSECUTOR]: . . . .  So you do have an expectation that they would be more honest,

4

but you would still judge their credibility just as you would anyone else?

[JUROR S]: Yes.

[THE PROSECUTOR]: And that expectation is based on your other relationships and how you view those individuals?

[JUROR S]: Yes.

[THE PROSECUTOR]: But would you just assume that they would be as credible as your friends?

[JUROR S]: I feel I try to judge everybody by what they say and what they do. But someone in the position of law enforcement or attorney or whatever, I look up to those people because that's what they're doing.

Defense counsel did not ask Juror S any follow-up questions about how he judges the credibility of members of law enforcement.

¶ 11    Defense counsel challenged Juror S for cause, arguing that he was biased due to his statements about law enforcement. The trial court denied the challenge, noting that Juror S

indicated he could judge law enforcement credibility like everyone else, even though he has friends in law enforcement. . . . [W]hile he indicated he looks up to those people, neither side really clarified whether or not those people really meant his friends that are in law enforcement or just law enforcement at large. But either way, the Court finds that there was an insufficient basis for me to determine that

5

he was going to be biased or otherwise unable to be impartial and fair in assessing the credibility. His statements, obviously, to the contrary, suggest otherwise.

¶ 12    The defense exhausted all of its peremptory challenges on other prospective jurors, and Juror S served on the jury.

### B.    Standard of Review and Applicable Law

¶ 13    We review a trial court's ruling on a challenge for cause for an abuse of discretion. *People v. Maestas*, 2014 COA 139M, ¶ 11. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or it misconstrues or misapplies the law. *Id.* This standard recognizes that the trial judge is in the best position to assess a potential juror's credibility, demeanor, and sincerity, including statements that may appear to be inconsistent or contradictory. People v. Sandoval, 733 P.2d 319, 321 (Colo. 1987).

¶ 14    An impartial jury is fundamental to a defendant's constitutional right to a fair trial. *See* Colo. Const. art. II, § 16. "While jurors often express concern or indicate preconceived beliefs during voir dire, such concerns and beliefs do not automatically disqualify them from service." *People v. Marciano*, 2014 COA

6

92M-2, ¶ 8.  However, when a juror "evinc[es] enmity or bias toward the defendant or the state," the trial court must sustain a challenge for cause unless "the court is satisfied, from the examination of the juror or from other evidence, that [the juror] will render an impartial verdict according to the law and the evidence submitted to the jury at the trial."  § 16-10-103(1)(j), C.R.S. 2025; *see* Crim. P. 24(b)(1)(X); *People v. Clemens*, 2017 CO 89, ¶ 15.  "The ultimate test to be applied in determining whether a juror should be dismissed for cause is whether it appears that the juror would render a fair and impartial verdict based on the evidence presented at trial and the instructions given by the court."  *People v. Vigil*, 718 P.2d 496, 500 (Colo. 1986).

¶ 15    We review any error in the denial of a challenge for cause under an "outcome-determinative analysis."  *People v. Novotny*, 2014 CO 18, ¶ 27.  Thus, a defendant must show prejudice to obtain reversal.  *Id.* at ¶ 30 (Hood, J., concurring in part and dissenting in part).  But if a juror who is biased against the defendant serves on the deliberating jury, the error is structural

and reversal is required.  *Clark v. People*, 2024 CO 55, ¶ 35; *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 29.

### C.    Discussion

¶ 16    Underwood asserts that Juror S expressed a bias in favor of law enforcement and, therefore, that the court abused its discretion by denying his challenge for cause.  We disagree.

¶ 17    The facts in this case are similar to those in *People v. Garrison*, 2012 COA 132M, ¶¶ 45-57.  There, the prospective juror said that "his father was a deputy sheriff, his mother was appointed 'special deputy for traffic and investigation' at an airport, and he had 'numerous friends' who worked in law enforcement."  *Id.* at ¶ 45.  He also said he generally believed law enforcement officers were more credible than lay witnesses.  *Id.*  Nevertheless, the prospective juror said that he would be fair and impartial to the defendant.  *Id.* at ¶ 54.  In affirming the trial court's denial of the challenge for cause, the division found that the trial court was in a better position to weigh and decide whether the prospective juror's conflicting testimony rendered him biased.  *Id.* at ¶ 56.

¶ 18    Like the juror in *Garrison*, Juror S indicated he would be fair and impartial.  Indeed, when he was asked, "So you do have an

8

expectation that [members of law enforcement] would be more honest, but you would still judge their credibility just as you would anyone else?" Juror S responded, unequivocally, "Yes." And he made it clear that he "would judge and listen to someone on law enforcement," indicating that he would not automatically believe a police officer and would instead "try to judge everybody by what they say and what they do." *See id.* at ¶ 55; *People v. Richardson*, 58 P.3d 1039, 1043 (Colo. App. 2002).

¶ 19    Moreover, Juror S had remained silent when the trial court asked the entire jury panel if anybody (1) could not follow the court's legal instructions; (2) could not set aside "sympathy or prejudice or bias"; or (3) had anything else "that might impact your ability to be fair and impartial if you're selected to serve as a juror in this case." *See Vigil*, 718 P.2d at 500. Notably, Juror S had previously volunteered an answer to a question posed to the entire panel, so the court could have "fairly attributed [his] silence to [his] willingness to follow the law as instructed by the court as opposed to a fear of speaking up." *Clemens*, ¶ 22.

¶ 20    Therefore, like the division in *Garrison*, ¶ 57, we conclude that the trial court here was in the best position to determine whether

Juror S "would render a fair and impartial verdict based on the evidence and the jury instructions." Accordingly, we discern no abuse of discretion in the court's ruling.

¶ 21     We are not persuaded otherwise by Underwood's reliance on *People v. Prator*, 833 P.2d 819, 821 (Colo. App. 1992), *aff'd*, 856 P.2d 837 (Colo. 1993). In *Prator*, a prospective juror's eldest son was a law enforcement officer. *Id.* Her husband and father-in-law were also former police officers. *Id.* When asked if she could remain unbiased, she replied, "I would like to believe I could do that." *Id.* However, upon further questioning, the prospective juror conceded that she "really" had a doubt in her mind as to whether she could set aside her personal feelings when she listened to the testimony. *Id.* She said that she thought she would "'end up' being biased." *Id.* A division of this court concluded that it was error for the trial court to deny the defense counsel's challenge for cause because the prospective juror could not be impartial. *Id.*

¶ 22     Unlike the juror in *Prator*, Juror S never expressed any concerns about being biased for either party, and he said that he would judge the credibility of members of law enforcement just as he would anyone else. Thus, "voir dire indicated only that he held

10

law enforcement officers in 'high regard,'" *Garrison*, ¶ 56, not that he "evinc[ed] enmity or bias toward the defendant or the state," § 16-10-103(1)(j).

### III.    Admission of Victim's Statements

¶ 23    Underwood next contends that the trial court plainly erred by allowing a police officer to testify about statements the victim made while being treated at the hospital.  We disagree.

### A.    Additional Background

¶ 24    The prosecutor called the victim as the first witness.  At the beginning of his testimony, the victim said that he has "a hard time thinking" as a result of "[s]evere brain damage" caused by "[s]wine flu hypoxia."  He further explained that he "lost a lot of memory of what happened" on the day of the stabbing, stating that "a lot of stuff got erased when they gave [him] 100 micrograms of Fentanyl in the ambulance."

¶ 25    So when the prosecutor asked whether he was "making phone calls or trying to contact Mr. Underwood during the day" of the stabbing, the victim answered that he could not remember.  Likewise, when questioned about how the argument with Underwood started, what the argument was about, how the

11

argument escalated into a physical altercation, and when he picked up the laundry detergent bottle, the victim repeatedly answered that he could not recall.

¶ 26    At the conclusion of the victim's testimony, neither the prosecutor nor defense counsel requested that the trial court continue his subpoena or require him to stay near the courthouse. The court excused the victim, though it did not explicitly release him from his subpoena.

¶ 27    Later that same morning, the prosecutor called a police officer who had accompanied the victim to the hospital on the day of the stabbing. The officer testified that, at the hospital, he had "tried to ask [the victim] about the events that occurred to obtain a full statement of what happened." When the prosecutor asked if he could recall what the victim had told him, the officer said:

> Vaguely, I remember some specific statements. He specifically stated that he was stabbed in the hand. He did state that, I believe, he had [Underwood] staying with him for a time. And over the course of that time, [Underwood] . . . had borrowed his phone and he was trying to get hold of [Underwood] using his work phone, calling his own phone because [Underwood] had his phone. And, apparently, this had aggravated [Underwood], which started the argument in the first place when they got back

to the apartment. And then once they were at the apartment, he said that . . . they got in an argument and [Underwood] turned off the lights. And then . . . he had a laundry detergent bottle and he got stabbed in the hand. It was pretty jumbled, I would say. He jumped from point to point in his story. It wasn't clear all the way through.

¶ 28     Defense counsel did not object to this testimony or attempt to recall the victim for further questioning about these statements.

### B.     Standard of Review and Applicable Law

¶ 29     We review the court's evidentiary rulings for an abuse of discretion. *Campbell v. People*, 2019 CO 66, ¶ 21. And we review de novo whether a defendant's confrontation rights have been violated. *People v. Miranda*, 2014 COA 102, ¶ 26, *abrogated on other grounds by*, *Rojas v. People*, 2022 CO 8, ¶ 44. But because Underwood did not preserve his evidentiary or confrontation challenges at trial, we will reverse only if the trial court's admission of the victim's statements amounted to plain error. *See People v. Arzabala*, 2012 COA 99, ¶ 83.

¶ 30     An error is plain if it is both obvious and substantial. *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005). An error is obvious if it contravenes a clear statutory command, a well-settled legal

13

principle, or Colorado case law. *People v. Pollard*, 2013 COA 31M, ¶ 40. An error is substantial if it so undermines the fundamental fairness of the proceeding itself as to cast serious doubt on the reliability of the judgment of conviction. *Hoggard v. People*, 2020 CO 54, ¶ 13.

¶ 31 Hearsay is a statement made by someone other than the declarant that is offered in evidence to prove the truth of the matter asserted. CRE 801(c). Hearsay is inadmissible unless an exception applies. CRE 802.

¶ 32 Section 16-10-201(1), C.R.S. 2025, provides that, in a criminal trial, a witness's prior inconsistent statement "may be shown by any otherwise competent evidence" if the proponent satisfies two foundational requirements. *See People v. Komar*, 2015 COA 171M, ¶ 52. First, the witness must either (1) have been given an opportunity to explain or deny the statement while testifying or (2) still be available to give further testimony. § 16-10-201(1)(a). And second, the previous inconsistent statement must "purport[] to relate to a matter within the witness's own knowledge." § 16-10-201(1)(b). If these requirements are satisfied, the prior

inconsistent statement is admissible not only for impeachment, but also as substantive evidence. *Id.*; *Komar*, ¶ 52.

¶ 33    Under the Confrontation Clause, testimonial out-of-court statements are not admissible in a criminal trial unless the declarant is unavailable and the defendant previously had an opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "Where a witness testifies at trial and is therefore subject to cross-examination, admission of the witness's prior out-of-court statements does not violate a defendant's Confrontation Clause rights." *People v. Acosta*, 2014 COA 82, ¶ 82. Even if the declarant does not remember making the statements, as long as the declarant is present and available to testify at trial, the defendant's confrontation rights are not violated. *People v. Argomaniz-Ramirez*, 102 P.3d 1015, 1017-18 (Colo. 2004).

C.    Discussion

¶ 34    Underwood does not dispute that the victim's hospital statements were inconsistent with his testimony at trial[1] and

---

[1] In *Davis v. People*, 2013 CO 57, ¶ 7 n.2, the supreme court noted that "[a] witness's actual or feigned memory loss is tantamount to denial," which can justify admission of a prior inconsistent statement under section 16-10-201(1), C.R.S. 2025.

related to matters within his personal knowledge. *See* § 16-10-201(1). Instead, Underwood contends that the trial court plainly erred by admitting the statements because (1) the foundational requirements of section 16-10-201(1)(a) were not satisfied as the victim was not given an opportunity to explain or deny the statements while testifying and was no longer available to give further testimony once the court excused him and (2) admitting the statements after the victim was excused violated Underwood's confrontation rights as he could not cross-examine the victim about the statements. We disagree.

¶ 35    First, even assuming that the victim was not "given an opportunity to explain or deny" the hospital statements, it was not obvious that he was no longer "available to give further testimony in the trial" after the trial court excused him. § 16-10-201(1)(a); *see People v. Stewart*, 568 P.2d 65, 67 (Colo. App. 1977) (even if a witness is not given an opportunity to explain or deny a prior statement, the witness's prior inconsistent statement is still admissible if the witness remains available to give further testimony). The hospital statements were admitted the same morning that the victim testified. Although the victim had been

16

excused, he had not been expressly released from his subpoena and nothing in the record suggests he was unavailable. Critically, defense counsel neither raised any concern regarding his availability at that time nor attempted to recall him after the officer testified about his hospital statements. *See People v. Smith,* 512 P.2d 269, 272 (Colo. 1973) (affirming admission of statements under a previous version of the statute where "[t]here was no showing that the statutory conditions to the admissibility of the prior inconsistent hearsay statements had not been met"); *see also LePage v. People*, 2014 CO 13, ¶ 15 ("According to the presumption of regularity, appellate courts presume that the trial judge did not commit error absent affirmative evidence otherwise."). And Underwood has not cited a Colorado case holding that excusing a witness necessarily renders him unavailable, nor are we aware of any. *See Pollard*, ¶ 40.

¶ 36 Second, it was not obvious that Underwood's confrontation rights were violated. The facts of this case appear to fit squarely within *Miranda*, ¶ 2, in which a division of this court held that

> the Confrontation Clause permits admission of testimonial hearsay after the declarant has testified and been released, provided that the

17

declarant testified concerning matters addressed in the declaration, the declarant was subject to cross-examination, and the defendant did not ask that the prosecution be required to recall the declarant for further cross-examination after the hearsay had been introduced.

¶ 37    These factors are met here:

- The victim testified that he did not remember trying to call Underwood on the day of the stabbing, how the argument began, what it was about, how it escalated into a physical altercation, or when he picked up the laundry detergent bottle.  Thus, the victim "testified concerning matters addressed in the" hospital statement, *Miranda*, ¶ 2 — namely, that the victim had been calling Underwood trying to get his phone back and "this had aggravated [Underwood], which started the argument in the first place when they got back to the apartment."  *See People v. Thomas*, 2014 COA 64, ¶ 20 (A witness's "testimony that she could not recall her prior statements amounted to a denial that she had made them.").

- The victim was subject to cross-examination, but defense counsel chose not to ask him about his lack of memory regarding the matters in the hospital statement.

- Defense counsel "did not ask that the prosecution be required to recall the declarant for further cross-examination after the hearsay had been introduced." *Miranda*, ¶ 2.

¶ 38　Nevertheless, Underwood attempts to distinguish this case from *Miranda.* But "where an alleged error is unclear under present law, the trial court does not commit plain error." *People v. Stroud*, 2014 COA 58, ¶ 33; *cf. Campbell v. People*, 2020 CO 49, ¶ 41 ("While one could argue the similarities between this case and [a previous case], we cannot say a judge would be expected to recognize those similarities without the benefit of an objection.").

¶ 39　Finally, and equally applicable to both the section 16-10-201(1)(a) and Confrontation Clause arguments, any error in admitting the hospital statements was not substantial. Underwood argues that "the hospital statements were the only evidence that contradicted Underwood's explanation" of how the argument started, "and without them, no evidence suggested that Underwood

was the initial aggressor."  But as Underwood himself correctly notes, Colorado case law "is clear that arguments and insults alone *do not* make someone an initial aggressor."  *See Castillo v. People*, 2018 CO 62, ¶ 44.  Thus, this case did not turn on who started the argument or on whether the argument was over a cell phone or a woman named Amy; it turned on who initiated the physical altercation and whether Underwood used reasonable force to defend himself in the apartment.  Accordingly, we cannot conclude that the admission of statements concerning who started the argument so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.  *See Hoggard*, ¶ 13.

¶ 40    Because any error was not obvious and was not substantial, we do not discern a basis for reversal.

## IV.    Prosecutorial Misconduct

¶ 41    Underwood contends the prosecutor committed misconduct during closing argument by (1) telling the jury that the law does not require that a person use force to be an initial aggressor; (2) "sarcastically comment[ing] on [the victim's] physical characteristics"; (3) "opin[ing] on Underwood's character in relation

to [the victim's] social life and mental abilities"; and (4) asking the jury to find justice for the victim.  We conclude that no plain error occurred.

### A. Applicable Law and Standard of Review

¶ 42    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 43    First, we determine whether the conduct was improper based on the totality of the circumstances.  *Id.*  We consider the context of the argument as a whole and view it in light of the evidence before the jury.  *People v. Samson*, 2012 COA 167, ¶ 30.  "A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts."  *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010).  The prosecutor may also "employ rhetorical devices and engage in oratorical embellishment."  *Samson*, ¶ 31.  Because arguments delivered in the heat of trial are not always perfectly scripted, we give the prosecutor the benefit of the doubt when his remarks are "ambiguous or simply inartful."  *Id.* at ¶ 30.  But the prosecutor may not misstate the evidence or the law, *id.* at ¶ 32; *People v.*

*Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd*, 119 P.3d 1073 (Colo. 2005), and the prosecutor "may not use arguments calculated to inflame the passions and prejudices of the jury," *People v. Nardine*, 2016 COA 85, ¶ 35.

¶ 44    Second, if we identify misconduct, then we determine whether it warrants reversal under the applicable standard of review. *Wend*, 235 P.3d at 1096. Underwood did not object to any of the alleged improper statements, so we review his unpreserved claims of prosecutorial misconduct for plain error. *See People v. Licona-Ortega*, 2022 COA 27, ¶ 86. To meet this standard, the conduct must be "flagrantly, glaringly, or tremendously improper" and "so undermine[] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict." *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).

"Prosecutorial misconduct in closing argument rarely constitutes plain error." *Weinreich*, 98 P.3d at 924.

### B.    Initial Aggressor

¶ 45    During his closing argument, defense counsel told the jury that

> [the victim] testified, saying I grabbed the laundry detergent bottle because I was feeling harassed.  I'll tell you why he was feeling harassed.  He was feeling harassed because of the argument that they were having about Amy. . . .  He wasn't being physically harassed, he wasn't being harassed at all.  [Underwood] was just telling [the victim] something he did not want to hear and that's what caused [the victim] to grab the laundry detergent bottle and start the fight.

The prosecutor responded to this argument during his rebuttal closing:

> This wasn't self-defense.  It was a heated argument.  Most fights start as a heated argument.  It doesn't mean you can't be the initial aggressor.  Look at the self-defense instruction that you have.  Does it require that an initial aggressor uses force?  Do you see that in there?  Would that make sense if the law requires that?  I mean, to what point does [the victim] have the right to say, hey, get off me?  There's no way he made contact, there is no evidence, . . . there is no bruising on [Underwood] to support that he was beat repeatedly with a laundry detergent bottle.  I

> think he got hit with soap. He had soap on him. That was the aggression that [the victim] had, going to throw some soap on you. That's fair. I'm going to take this knife and cut your hand. Does that seem like a reasonable amount of force to you? Bringing a knife to a soap fight? This was not self-defense.

¶ 46     Underwood contends that the prosecutor's rebuttal closing "suggested to the jury . . . that Underwood could be the initial aggressor *without* using or threatening physical force." *See Castillo*, ¶ 44. But the prosecutor's statement that the self-defense jury instruction did not "require that an initial aggressor uses force" was a correct statement of law. The Colorado Supreme Court has defined an "initial aggressor" as "the person who 'initiated the physical conflict by using *or threatening the imminent use of* unlawful physical force.'" *Id.* at ¶ 43 (emphasis added) (citation omitted).

¶ 47     Viewing the prosecutor's remark in context with the rest of his statements, the prosecutor was not suggesting that mere argument could make someone an initial aggressor. Instead, it appears that the prosecutor was arguing either that Underwood's physical conduct during the argument constituted a threat of the imminent use of physical force, *see id.* at ¶ 44 ("[A] physically threatening

24

action would make someone an initial aggressor."), or that Underwood was the initial aggressor when he cut the victim's hand because the victim's act of "throw[ing] some soap on" Underwood did not make the victim the initial aggressor.

¶ 48 Given these reasonable interpretations of the prosecutor's statement, we decline to assume that he was attempting to suggest that Underwood became the initial aggressor through mere argument. Making this assumption, as Underwood asks us to do, would be contrary to the requirement that we give the prosecutor the benefit of the doubt when his remarks are "ambiguous or simply inartful." *Samson*, ¶ 30. Accordingly, we conclude that the statement was not improper.

### C. The Victim's Characteristics

¶ 49 During closing argument, defense counsel argued that Underwood was

> scared of [the victim] given the size difference and given what he knows about [the victim]. [The victim] had talked about how he had went to military school. [Underwood] had this belief that he had gone to military school and had military training. And so not only was there the size discrepancy, but there was this skill level and combat discrepancy to where [Underwood] has the belief that [the victim]

25

has combat training and would be able to cause even more damage than somebody who just is merely the [sic] size.

The prosecutor directly responded to this argument:

[The victim] is a large man with military training, right? I mean, he's probably a tier one special operations ninja. And when you look at Mr. Underwood, despite the fact that he was getting repeatedly hit by this giant with ninja training, he has no marks, zero. He says I'm covered in soap. Does that story make sense? Is that plausible?

. . . .

Let's take a look at [the victim's] size. Does he look like a giant, lethal force? He has no upper body. Look at those shoulders. He's tall and he's fat. It's not a nice way to put it. He is not a huge menacing character. You heard from him, he walks around scared. He's been beat up numerous times. His experience in military school, he got beat up.

¶ 50    Underwood contends that "[t]hese statements served no purpose other than to inflame the passions of the jury" and that "[t]he prosecutor could have described evidence of [the victim's] physical . . . characteristics without resorting to sarcastic, mocking comments that appealed to the jurors' sympathy." But the prosecutor's remarks directly responded to defense counsel's argument that Underwood reasonably feared the victim due to the

26

victim's size and military training. The "prosecutor is afforded considerable latitude in replying to an argument by defense counsel," *People v. Lovato*, 2014 COA 113, ¶ 63 (quoting *People v. Perea*, 126 P.3d 241, 247 (Colo. App. 2005)), and he is allowed to "employ rhetorical devices and engage in oratorical embellishment," *Samson*, ¶ 31. We conclude that the prosecutor's statements were "no more than . . . oratorical embellishment and w[ere] not unfairly prejudicial." *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003). Thus, they were not improper.

### D. The Dynamic Between Underwood and the Victim

¶ 51 During his rebuttal closing, the prosecutor told the jury that the victim

> makes friends with people that work [with him]. Take Mr. Underwood, for example, a guy that's kind of living on the streets, kind of street smart. For [the victim], it's an opportunity to have a friend. You can come stay with me. He's that lonely. Type of person like Mr. Underwood, been around the block once, sees the opportunity, can get up from living on the streets. This guy is not smart, he is not going to be hard to manipulate, control, push around a little bit. Sure, he's tall, he weighs more. Maybe if he sits on you or hits you with soap.

27

¶ 52    Underwood argues that these statements were (1) not based on evidence presented at trial"; (2) irrelevant; and (3) intended to "capitalize[] on society's predisposition against the unhoused (like Underwood) as opportunistic and manipulative, and on sympathy for the lonely and friendless."  We disagree.

¶ 53    First, the prosecutor did not improperly comment on facts not in evidence.  It was undisputed that Underwood was living on the streets before the victim invited him to stay at the victim's apartment.  And the prosecutor had "wide latitude to make arguments based on facts in evidence *and reasonable inferences drawn from those facts*."  *Strock*, 252 P.3d at 1153 (emphasis added).  Given Underwood's experience living on the streets, it is reasonable to infer that he had some "street smarts."  And given that the victim invited Underwood to stay in his studio apartment for free, it is reasonable to infer that the victim was lonely.  Thus, the statements were based on evidence presented at trial.

¶ 54    Second, the statements were relevant.  Underwood's theory at trial was that the victim was the aggressor and that Underwood, being smaller and meeker, had to stab the victim to defend himself.  Therefore, the social dynamic between the two men was relevant to

self-defense — the central issue at trial — and the prosecutor's statements were relevant to that dynamic.

¶ 55     Third, given that the statements were based on the evidence presented at trial and were relevant to the core issue, we are not persuaded that the prosecutor was attempting to "capitalize[] on society's predisposition against the unhoused . . . and on sympathy for the lonely and friendless." *See Samson*, ¶ 30.

### E.     Justice for the Victim

¶ 56     The prosecutor concluded his rebuttal closing by telling the jury that it

> should and need[s] to find Mr. Underwood accountable for his actions. People like [the victim] deserve justice. Just because he is not able to articulate things nearly as well, he still has rights. We need to find him justice. Find Mr. Underwood guilty, hold him accountable.

¶ 57     The prosecutor's statements about justice for the victim were improper, and they were obviously so. *See, e.g., People v. Marko*, 2015 COA 139, ¶ 221, *aff'd on other grounds*, 2018 CO 97. However, we conclude that they were not "flagrantly, glaringly, or tremendously improper" and did not "so undermine[] the fundamental fairness of the trial itself as to cast serious doubt on

the reliability of the jury's verdict." *Domingo-Gomez*, 125 P.3d at 1053 (quoting *Avila*, 944 P.2d at 676).

¶ 58     The statements "were 'few in number, momentary in length, and were a very small part of a rather prosaic summation.'" *Id.* (quoting *People v. Mason*, 643 P.2d 745, 753 (Colo. 1982)).  And rather than "pressur[ing] jurors by suggesting that guilty verdicts [were] necessary to do justice for a *sympathetic* victim," *People v. McBride*, 228 P.3d 216, 223 (Colo. App. 2009) (emphasis added), the improper remarks were made in the context of asking the jury not to acquit Underwood merely because of the victim's difficulty expressing himself on the stand.  *See Domingo-Gomez*, 125 P.3d at 1053 (In determining if improper statements amount to plain error, "[f]actors to consider include . . . the context in which the statements were made.").  And the failure to object to the statements "may 'demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging.'" *Strock*, 252 P.3d at 1153 (quoting *People v. Rodriguez*, 794 P.2d 965, 972 (Colo. 1990)).

¶ 59     Moreover, the jury returned a split verdict.  "While a split verdict does not conclusively decide the harmlessness question, it is

30

'an indication that the jurors exercised some discretion in their deliberations' and that the error did not cause them to 'blindly convict the defendant.'" *Washington v. People*, 2024 CO 26, ¶ 35 (quoting *Martin v. People*, 738 P.2d 789, 795-96 (Colo. 1987)). The jury returned a guilty verdict only for second degree assault with a deadly weapon as a lesser included offense of first degree assault; it acquitted Underwood of first degree assault, second degree assault — serious bodily injury, and menacing. And in a special interrogatory, the jury found that Underwood did not cause serious bodily injury to the victim. Thus, it is evident that the jury's verdict was not motivated by sympathy toward the victim. The prosecutor's improper statements do not cast serious doubt on the reliability of the jury's verdict and, accordingly, do not amount to plain error. *See Domingo-Gomez*, 125 P.3d at 1053.

## V. Cumulative Error

¶ 60 Finally, Underwood contends that the cumulative effect of the alleged errors at his trial mandates reversal. We are not persuaded.

¶ 61 "The doctrine of cumulative error requires that numerous errors be committed, not merely alleged." *People v. Conyac*, 2014 COA 8M, ¶ 152. Under this doctrine, while an error may be

31

harmless in isolation, reversal is required when the cumulative effect of multiple errors or defects substantially affects the fairness of the trial or undermines the integrity of the factfinding process. *Howard-Walker v. People*, 2019 CO 69, ¶ 24.

¶ 62     We have assumed, for the purpose of our plain error analysis, that it was error for the trial court to allow a police officer to testify about statements the victim made at the hospital, and we have concluded that the prosecutor made improper statements about doing justice for the victim.[2]  However, we concluded that these errors, individually, did not constitute plain error.

¶ 63     For the same reasons we did not find that the admission of the hospital statements and the prosecutor's improper remarks were, individually, substantial error, we now further conclude that the cumulative effect of the two errors did not substantially impact the

---

[2] We flatly reject Underwood's assertion that our cumulative error analysis should also consider prejudice caused from the trial court's proper use of its discretion by declining to remove Juror S for cause.

fairness of the trial or undermine the integrity of the factfinding process. *See id.*

## VI. Disposition

¶ 64    The judgment is affirmed.

JUDGE FREYRE and JUDGE PAWAR concur.