22CA2252 Peo v Monte 03-05-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2252
Jefferson County District Court No. 21CR716
Honorable Russell Klein, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Lorenzo Owen Monte,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE KUHN
Fox and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 5, 2026

---

Philip J. Weiser, Attorney General, Patrick A. Withers, Assistant Solicitor General & Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jeffrey A. Wermer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Lorenzo Owen Monte, was convicted of attempted first degree murder as a crime of violence, first degree assault, and second degree kidnapping.  He now appeals the attempted first-degree murder and first degree assault convictions and sentences. We affirm.

## I.    Background

¶ 2    Heather Tallant first met Monte in March 2020.  The two became friends, and the friendship soon progressed into a romantic relationship.  Monte moved into Tallant's home later that year.

¶ 3    One morning about a year later, Tallant woke up around 3:48 a.m. and headed upstairs for a glass of water.  As she headed back towards the stairs, she noticed Monte sitting on the couch with "Fireball shooters all over the table."  Tallant continued towards the stairs and Monte followed her.  As Tallant started down the stairs, Monte grabbed her by her hair and pulled her back up the stairs. He "slammed" her against the wall on one side of the kitchen and again into a wall on the other side of the kitchen where Tallant "smacked [her] head" and fell to the floor.  Tallant tried to fight back against Monte and get away, but previous nerve damage to her back made trying to defend herself difficult and painful.

1

¶ 4    After Tallant fell to the floor, Monte got on top of her and began to strangle her with his hands.  She "blacked out a couple times, . . . couldn't breathe[,] and . . . started seeing stars."  This went on for a couple minutes.  Throughout the encounter, Monte repeatedly threatened to kill Tallant and called her "worthless."  Monte also threatened to kill Tallant's mom and "go after [her] dog" if she "told anybody anything."

¶ 5    Monte then got off of Tallant and asked her to sit down on the couch.  The two started having a conversation.  But Monte "flipped out" on Tallant, and she ended up in the corner of her living room.  Monte was convinced that Tallant was a "snitch for the DEA" and that she was wearing a wire, so he "ripped" off all of her clothes.  Monte then started "whipping" Tallant on the back with a phone cord.

¶ 6    As Tallant tried to get away and run back downstairs towards her bedroom, Monte pushed Tallant down the stairs and into the bathroom wall.  Monte came down the stairs, grabbed Tallant, and again "slammed" her onto the "hardwood floor."  Tallant once again lost consciousness.  When she came to, Tallant was inside of the bathtub.  She was on her back and underneath the open faucet,

while Monte was on top of her "trying to drown [her]." Monte made sure that Tallant's "nose was closed[,] and . . . [her] mouth was open." This went on for five to ten minutes.

¶ 7     Monte then dragged Tallant to her bedroom, where he pushed her to the floor and sat on top of her. Tallant started screaming and Monte "beat" her on the left side of her face with his fists. Tallant lost consciousness and woke up a few hours later with "blood all over [her] face." She went to the bathroom to wash the blood off of her face, and Monte professed his love for her multiple times.

¶ 8     Later that day, police arrived at Tallant's home to arrest Monte on an unrelated matter. Officers asked Tallant about the injuries on her face and neck, and Tallant claimed that she had gotten into a fight at a bar with another woman. Despite this interaction, Tallant called 911 later that night and reported the incident. Tallant's mom later joined her at her home. They agreed to go to the hospital "just in case [Tallant] had a concussion."

¶ 9     The prosecution charged Monte with attempted first degree murder as a crime of violence, first degree assault by strangulation, second degree kidnapping, third degree assault, and a crime of

3

violence sentence enhancer. *See* §§ 18-3-102(1)(a), 18-2-101, 18-3-202(1)(g), 18-3-302(1), 18-3-204(1)(a), 18-1.3-406(2)(a)(I)(B), C.R.S. 2025. A jury convicted him of attempted first degree murder as a crime of violence, first degree assault by strangulation, and second degree kidnapping.

¶ 10    Monte now appeals the attempted first degree murder and first degree assault convictions and sentences.

## II.    Analysis

¶ 11    Monte contends that (1) insufficient evidence supported the jury's serious bodily injury finding for the crime of violence finding and the first degree assault conviction. He also contends that the court reversibly erred by (2) improperly instructing the jury on the law governing serious bodily injuries; (3) admitting into evidence an "incomplete and misleading legal definition of serious bodily injury"; and (4) permitting "pervasive prosecutorial misconduct." Finally, Monte contends that (5) the trial court should have granted him a mistrial and (6) cumulative error requires reversal.

### A.    Sufficiency of the Evidence

¶ 12    Monte contends that the prosecution presented insufficient evidence to prove that he caused serious bodily injury to Tallant,

which is an essential element of both first degree assault and the crime of violence sentence enhancer.

### 1. Applicable Law and Standard of Review

¶ 13     We apply the substantial evidence test to determine if the prosecution introduced evidence "sufficient both in quantity and quality to sustain the defendant's conviction." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). In doing so, we review the record de novo and consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Id.* (quoting *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973)); *see also McCoy v. People*, 2019 CO 44, ¶ 17.

¶ 14     A person commits first degree murder if "[a]fter deliberation and with the intent to cause the death of a[nother] person . . . [they] cause[] the death of that person or of another person." § 18-3-102. Attempted first degree murder requires that a person take a "substantial step" towards committing first degree murder. § 18-2-101. When a person "[c]aused serious bodily injury or death

5

to any other person except another participant" during an attempted first degree murder, they are subject to mandatory sentencing under the crime of violence statute. § 18-1.3-406(1)(a), (2)(a)(I)(B), (2)(a)(II)(B).

¶ 15 A person commits first degree assault by strangulation when "[w]ith the intent to cause serious bodily injury, he or she applies sufficient pressure to impede or restrict the breathing or circulation of the blood of another person by applying such pressure to the neck or by blocking the nose or mouth of the other person and thereby causes serious bodily injury." § 18-3-202(1)(g).

¶ 16 Bodily injury is "physical pain, illness, or any impairment of physical or mental condition." § 18-1-901(3)(c). And serious bodily injury is

> bodily injury that, either at the time of the actual injury or at a later time, involves a substantial risk of death; a substantial risk of serious permanent disfigurement; a substantial risk of protracted loss or impairment of the function of any part or the organ of the body; or breaks, fractures, a penetrating knife or penetrating wound, or burns of the second or third degree.

§ 18-1-901(3)(p).

6

## 2. Sufficient Evidence Supported the SBI Finding

¶ 17    The foundation of Monte's argument that insufficient evidence supported the jury's serious bodily injury determination is *People v. Vigil*, 2021 CO 46.  In *Vigil*, the victim was stabbed in the neck.  *Id.* at ¶ 5.  He sustained minor injuries and the serious bodily injury form (SBI form) indicated "that the stab wound to the neck did not constitute serious bodily injury."  *Id.* at ¶ 6.  However, at a preliminary hearing, the doctor who signed off on the SBI form had a "change of heart" and testified that the stab wound itself, knowing nothing else, constituted a substantial risk of death because "a stab wound to the neck *could* create certain risks with respect to blood vessels, lungs, esophagus, and other critical components of the body."  *Id.* at ¶¶ 8-9 (alteration in original).

¶ 18    The supreme court clarified the definition of a "substantial risk of death."  The court concluded that there is a nexus between the facts of the actual injury and the substantial risk of death.  *Id.* at ¶ 32.  Accordingly, the court held that "the facts of the actual injury control the substantial risk of death determination under section

18-1-901(3)(p), *not* the risk generally associated with the type of conduct or injury in question." *Id.* at ¶ 16 (alteration in original).

¶ 19    Monte argues that insufficient evidence supports his conviction because the evidence didn't show that Tallant had suffered one of "four general risks that can lead to death" from the strangulation or drowning: (1) damage to neck bones or spinal cord; (2) damage to blood vessels or arteries; (3) damage to the brain; or (4) cardiac arrest. We are not convinced.

¶ 20    When Tallant arrived at the hospital, she was "immediately taken into a room[,]" where hospital personnel began evaluating her. Dr. Bartholomew Paull ordered a CT scan and a CTA scan to image Tallant's head and cervical spine. As Monte points out, Dr. Paull testified at trial that the CT scan was "unremarkable," showing that Tallant did not have any broken bones in her neck and the bones were in "normal alignment." Likewise, the CTA scan also came back "unremarkable." He testified that the "blood vessels that were imaged showed normal blood flow, and there wasn't damage done to the . . . linings of the arteries." Dr. Paull also testified that Tallant's lungs sounded normal, and the neurological exam revealed that Tallant could "move all her extremities" and feel

her arms and legs. Accordingly, he eventually discharged Tallant to self-care at home.

¶ 21     While it's true that this evidence doesn't support the four risks that Monte identifies, we don't think those risks properly frame the issue. We must determine whether there was sufficient evidence from which a reasonable juror could have concluded that Tallant suffered "physical pain, illness, or any impairment of physical or mental condition," which "at the time of the actual injury or at a later time, involves a substantial risk of death[] . . . [or] a substantial risk of protracted loss or impairment." § 18-1-901(3)(b), (p).

¶ 22     The prosecution presented evidence showing that Tallant had suffered "physical pain, illness, or any impairment of physical or mental condition." *Id.* Tallant testified that when she arrived at the hospital, she was still in pain, she was seeing stars, and she had a raspy voice. Dr. Paull testified that he saw bruising on Tallant's "legs, her buttocks, [and] the side of her neck[,]" along with cuts on her lips. He also saw petechiae — small purple and red spots that indicate bleeding from small blood vessels — on Tallant's neck. Those suggested that Tallant's "neck was under a high degree of

pressure." Dr. Paull's primary diagnosis for Tallant was "assault by manual strangulation."

¶ 23    Forensic Nurse Examiner (FNE) Tanya Hunsaker also testified at trial. During her examination, FNE Hunsaker noticed Tallant's raspy voice and "petechiae on her neck and her face, under her eyes, her eyelid, and the whites of her eyes." She testified that during strangulation, when pressure is applied to the neck, blood cannot drain back down from the brain resulting in the petechiae. She also testified to "the bruising on [Tallant's] face and neck." FNE Hunsaker testified that Tallant's "throat was very red and very sore" and that Tallant "had a hard time swallowing." FNE Hunsaker testified that Tallant reported losing consciousness more than once during the incident. FNE Hunsaker also testified that during the examination, she observed, or Tallant reported, that Tallant had experienced the following in connection with the assault: neck pain, sore throat, memory loss, weakness or numbness in the extremities, nausea, dizziness, headache, lightheadedness, loss of consciousness, vision changes, difficulty swallowing, hoarse or raspy voice, coughing more than normal, and neck swelling.

¶ 24    FNE Hunsaker completed an SBI form after examining Tallant. On the form, FNE Hunsaker indicated that, at the time of examination, Tallant had petechiae in the face, neck, and eyes; neck pain; numbness in her right thumb and hand; and that she reported difficulty swallowing. She indicated that Tallant's injuries involved "a substantial risk of death." She indicated that her reason for this opinion was that Tallant "was strangled multiple times [with loss of consciousness with] the intent to impede or restrict circulation/oxygenation to the brain."

¶ 25    FNE Hunsaker also explained why these details were important. She testified that it is "very important" to know that Tallant had lost consciousness multiple times "because that is indicative of the . . . lethality of the strangulation. If you lose consciousness, you're losing blood flow to your brain, which means you're losing brain cells." She testified that it only takes eleven pounds of pressure to cut off oxygenated blood flow to the brain, while it takes twenty pounds of pressure to open a soda can. Under these circumstances, she testified, it takes about ten seconds for someone to lose consciousness. And while FNE Hunsaker testified about the injuries that could follow a strangulation, she also

testified that Tallant's loss of consciousness indicated that she had lost blood flow to her brain, which she said informed her expert opinion that there was a risk of death in this case. Moreover, the prosecutor and FNE Hunsaker engaged in the following exchange:

> Q: I want to talk to you specifically about the types of injuries that you were talking about, which is . . . the blood restriction at the time of that injury. At the time of that injury, was the blood restriction, in your opinion, and the things that were going on a substantial risk of death to Ms. Tallant?
>
> A: Yes.

¶ 26    We therefore disagree with Monte's argument. Viewing the record in the light most favorable to the prosecution, there was ample evidence before the jury for it to conclude that when Monte repeatedly strangled Tallant into unconsciousness, she suffered "physical pain, illness, or an[] impairment of physical or mental condition." *See* § 18-1-901(3)(b). And there was ample evidence from which the jury could conclude that the strangulation cut off the flow of blood to Tallant's brain, depriving her brain of oxygen, and causing a substantial risk of death at that time. *See* § 18-1-901(3)(p). The fact that Tallant didn't die or suffer other potential consequences of strangulation doesn't change this

analysis. As the supreme court noted, an injury "which involves substantial risk of death does not become any less of a serious bodily injury because the victim recovers." *Vigil*, ¶ 32.

¶ 27 Thus, we conclude that there was sufficient and substantial evidence from which a reasonable juror could have concluded that Monte caused serious bodily injury to Tallant by repeatedly strangling her.

## B. Jury Instruction

¶ 28 Monte contends that the trial court erred when it refused to incorporate *Vigil*'s holding into the jury instruction defining serious bodily injury. More specifically, Monte argues that the "*Vigil* instruction was crucial here because reasonable people of common intelligence have routinely misunderstood the [serious bodily injury] statutory definition." We are not convinced.

### 1. Applicable Law and Standard of Review

¶ 29 A trial court must properly instruct the jury on the applicable law. *People v. Zukowski*, 260 P.3d 339, 343 (Colo. App. 2010). "We review jury instructions de novo to determine whether the instructions accurately informed the jury of the governing law." *Id.* However, as long as they are correct statements of the law, the trial

13

court has substantial discretion in formulating the jury instructions. *Id.* "We review a court's decision to give a particular jury instruction for an abuse of discretion. A court abuses its discretion if it bases its ruling on an erroneous understanding or application of the law." *People v. Coahran*, 2019 COA 6, ¶ 14 (citation omitted).

¶ 30 "[I]f a statutory definition does not adequately inform the jury of the governing law, additional instructions are required." *People v. Perez*, 2024 COA 94, ¶ 36 (alteration in original) (quoting *People v. Mendenhall*, 2015 COA 107M, ¶ 24). However, "when 'a term, word, or phrase in a jury instruction is one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning, an instruction defining it is not required.'" *Id.* (quoting *Garcia v. People*, 2023 CO 30, ¶ 20).

### 2. The Court Did Not Improperly Instruct the Jury

¶ 31 During the jury instruction conference, defense counsel proposed adding language to the statutory definition. Instead of using section 18-1-901(3)(p)'s definition of serious bodily injury,

counsel proposed the following supplemental language: "The facts of the actual injury control the substantial risk of death determination for 'serious bodily injury', not the risk generally associated with the type of conduct or injury in question."

¶ 32 The trial court acknowledged that the proposed language accurately represented *Vigil*'s holding. But the court was hesitant to include Monte's proposed instruction because it couldn't figure out how to "mesh" the two definitions together without running the "risk of seriously confusing these definitions."

¶ 33 The court instructed the jury as follows:

> Serious bodily injury means bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree.

¶ 34 To start, the jury instruction is almost identical to the definition of serious bodily injury in section 18-1-901(3)(p). The given instruction omits only a few words, which do not significantly alter the statutory definition. As a general rule, "jury instructions

15

framed in the language of statutes are usually adequate and proper." *Zukowski,* 260 P.3d at 343.

¶ 35    Next, we agree with the People that while the *Vigil* court clarified that "the facts of the actual injury" determine whether there was a substantial risk of death rather than the "risk generally associated with the type of conduct or injury in question[,]" it did not conclude that the statute was ambiguous. *Vigil,* ¶ 16. "A statute is ambiguous when it is reasonably susceptible of multiple interpretations." *McCoy,* ¶ 38. Monte does not argue that the definition of serious bodily injury is susceptible to multiple interpretations. He instead argues that the language "at the time of actual injury *or at a later time*" in the serious bodily injury definition allowed the jury to consider the general risks of strangulation rather than Tallant's actual injuries. But we think the instruction properly states the law. The instruction doesn't suggest that the jury can make its decision based on generalized risks. Instead, the instruction correctly states that the jury must consider the bodily injury and whether that injury posed a substantial risk of death. We therefore conclude that the jury instruction properly stated the applicable law.

¶ 36     Given this conclusion, we see no abuse of discretion in the trial court's decision not to incorporate *Vigil*'s holding into the instruction that followed the statutory definition.  Given the trial court's "substantial discretion in formulating the jury instructions[,]" *Zukowski*, 260 P.3d at 343, we perceive no error in this decision.

## C.     SBI Form

¶ 37     Monte contends that the trial court reversibly erred when it admitted FNE Hunsaker's SBI form.  At trial, defense counsel objected to the form as containing hearsay and argued that it "contained an incomplete and inaccurate statement of the law on SBI."  The court overruled the objection, noting that "these documents are typically admitted in these cases."  On appeal, Monte argues that the ruling should be reversed under CRE 403 because "evidence must be excluded if its probative value is substantially outweighed by the danger of misleading the jury." Specifically, Monte argues that the SBI form had no probative value because (1) the court should have instructed the jury instead of permitting the form to do so and (2) FNE Hunsaker could have testified to the other information in the form.  We are not convinced.

17

¶ 38    Relevant evidence may be excluded under CRE 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." "We review a trial court's evidentiary decisions for an abuse of discretion." *People v. Ramos*, 2017 CO 6, ¶ 5.

¶ 39    While it's true that the SBI form contained the statutory definition of serious bodily injury, that doesn't make it an instruction. The court properly instructed the jury that the court would decide what law applies to the case and that the jurors must apply that law as stated in the instructions. We presume that the jurors followed that instruction. *People v. McKeel*, 246 P.3d 638, 641 (Colo. 2010). Regardless, the serious bodily injury definition on the SBI form tracked the statutory definition, which, as we conclude above, correctly stated the law.

¶ 40    As for FNE Hunsaker's testimony, the contents of the form summarized her opinion at the time of the examination about whether Tallant's injuries constituted serious bodily injury, which was ultimately a fact question for the jury. *See People v. Baker*, 178 P.3d 1225, 1233 (Colo. App. 2007). The form's contents therefore had probative value. *See* CRE 401. And even if the form was

cumulative of FNE Hunsaker's trial testimony, that doesn't make it inadmissible. *See People v. Salas*, 902 P.2d 398, 401 (Colo. App. 1994).

¶ 41    Accordingly, the court did not abuse its discretion when it admitted the SBI form into evidence.

## D.    Prosecutorial Misconduct

¶ 42    Monte contends that the trial court permitted "pervasive prosecutorial" misconduct on numerous occasions requiring reversal. He argues that the challenged statements (1) misstated the law; (2) misled the jury by referring to facts not in evidence; (3) shifted the burden of proof to Monte; or (4) appealed to the jury's sympathies and prejudices. We consider each prosecutorial claim in turn.

### 1.    Applicable Law and Standard of Review

¶ 43    We conduct a two-step analysis to review prosecutorial misconduct claims. *People v. Robinson*, 2019 CO 102, ¶ 18. "First, we must determine whether the prosecutor's conduct was improper 'based on the totality of the circumstances.'" *Id.* (quoting *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010)). If we determine that the

conduct was improper, then "we must decide whether such actions warrant reversal according to the proper standard of review." *Id.*

¶ 44     "We review preserved claims of prosecutorial misconduct under the nonconstitutional harmless error standard." *People v. Walker*, 2022 COA 15, ¶ 28. We reverse under this standard "only if the error substantially influenced the verdict or affected the fairness of the trial." *Id.* However, if the defendant doesn't object at trial, the prosecutorial misconduct claim is unpreserved, and we apply the plain error standard. *Robinson*, ¶ 19. Plain error is "error that was obvious and substantial and that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Id.* We only reverse plain error for prosecutorial misconduct when it was "flagrantly, glaringly, or tremendously improper." *Id.* (quoting *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005)). Prosecutorial misconduct during closing arguments is rarely "so egregious as to constitute plain error*." People v. Constant*, 645 P.2d 843, 847 (Colo. 1982) (quoting *People v. Sepeda*, 581 P.2d 723, 732 (Colo. 1978)).

## 2.    Misstating the Law

¶ 45    Monte contends that the prosecutor misstated the law of serious bodily injury during closing arguments.  "Although a prosecutor may argue all reasonable inferences from the evidence in the record, he or she may not misstate or misinterpret the law." *People v. McMinn,* 2013 COA 94, ¶ 62.

¶ 46    The prosecutor stated "[t]he defendant wants you to believe that there's no serious bodily injury because Ms. Tallant did not suffer a stroke, blood clot, or have an abnormal CT scan.  Ladies and gentlemen, that's not what serious bodily injury is.  The end result is not what matters."  After the court overruled a defense objection, the prosecutor continued, "What matters is that loss of consciousness is the beginning of death.  That's a basic concept."

¶ 47    We don't perceive this as a misstatement of the law.  Instead, the prosecutor was appealing to the jury to focus on Tallant's loss of consciousness rather than the negative test results.  In context, the prosecutor's argument was attempting to convince the jury that Tallant's loss of consciousness constituted a serious bodily injury.  Accordingly, we perceive no error in the court's ruling.

### 3. Misleading the Jury By Referencing Facts Not in Evidence

¶ 48 Monte contends that the prosecutor referred to facts not in evidence on three different occasions and thereby misled the jury. While it is improper for the prosecutor to misstate the facts during closing arguments, it only rises to the level of misconduct when the misstatement is intentional, and the prosecutor intends to "mislead the jury as to the inferences it may draw [from the evidence.]" *Domingo-Gomez,* 125 P.3d at 1049 (quoting ABA Standards, § 3-5.8).

¶ 49 First, Monte argues that the prosecutor misled the jury when she argued that Dr. Paull found petechiae in Tallant's eyes. More specifically, during closing argument, the prosecutor stated that the jury "heard testimony from Dr. Paull and FNE Hunsaker about the petechiae they both saw in [Tallant's] eyes." Defense counsel objected that this misstated the facts, arguing that Dr. Paull did not find petechiae in Tallant's eyes. The court overruled the objection and disagreed with the defense as it had "double-checked [its] notes."

¶ 50     Defense counsel later questioned this statement, saying "You heard from Dr. Paull . . . that she did not have petechiae in her eyes." The prosecutor objected and argued that the court "just ruled that the statement is an inaccurate reflection of the testimony we heard." The court then overruled the objection, permitting the defense to raise questions about Dr. Paull's testimony.

¶ 51     A review of the record reveals that Dr. Paull referred to petechiae two times during his testimony. Both times he testified that he saw petechiae only on Tallant's neck. Therefore, defense counsel was correct that Dr. Paull did not testify to seeing petechiae in Tallant's eyes. However, we see no indication that the prosecutor made this statement intending to mislead the jury. And the statement was partially correct because FNE Hunsaker testified to seeing petechiae in Tallant's eyes. Given that testimony, we don't see — and Monte doesn't explain — how this erroneous ruling was prejudicial. Accordingly, we conclude it was harmless.

¶ 52     Second, Monte argues that the prosecutor misled the jury when, in an attempt to argue the seriousness of strangulation, she said, "Think about why, in Colorado, the police prohibited the use of chokeholds." Monte objected to the statement on the ground that

23

these facts were not in evidence, which the trial court sustained. The court then instructed the jurors that "they should not consider any information regarding why police may or may not have barred chokeholds."

¶ 53    While a prosecutor has "wide latitude in the language and presentation style used to obtain justice[,]" a prosecutor may not refer to facts not admitted into evidence. *People v. Burdette*, 2024 COA 38, ¶ 62 (quoting *Domingo-Gomez*, 125 P.3d at 1048). It was improper for the prosecutor to refer to police chokehold bans. However, we agree with the People that Monte again does not explain how the court's ruling was prejudicial. The court sustained Monte's objection and instructed the jury to not consider whether "police may or may not have barred chokeholds." We presume that the jurors followed this instruction. *McKeel*, 246 P.3d at 641. And because the defense obtained relief — and Monte did not request further relief — "we need not consider this alleged error." *People v. Douglas*, 2012 COA 57, ¶ 65; *see also People v. Garcia*, 526 P.2d 292, 294 (Colo. 1974) (holding that because the trial court sustained the defendant's objection, the possibility of prejudice was eliminated).

¶ 54    Third, Monte argues that the prosecutor improperly referred to "intimate partner violence manipulation" because no evidence was presented on that topic.  During closing arguments, the prosecutor talked about how Tallant did not initially report the crime to the police "because she loved him."  The prosecutor then referred to a jail call between Monte and Tallant and said, "Listen to how he talks to her in the jail call.  Listen to the classic intimate partner violence manipulation.  You're the only one that can help me now.  You're the only one that can help me get out of here."

¶ 55    Monte did not object to this statement, so we review it for plain error.  *See Robinson,* ¶ 19.  It's true that there was no expert testimony specifically about "intimate partner manipulation."  But based on what Monte told Tallant during the jail call, the prosecutor could argue that Monte was manipulating her when he pleaded for help just one day after the incident.  And as the People point out, Detective Jeffrey Adams testified to his experience with domestic violence cases and that some witnesses can be "reluctant or uncooperative because of the nature of their relationship."  Given this testimony, we conclude that even if the argument was

improper, it wasn't "flagrantly, glaringly, or tremendously improper." *Domingo-Gomez*, 125 P.3d at 1053.

### 4. Shifting the Burden of Proof

¶ 56    Monte contends that the prosecution improperly shifted its burden of proof twice during closing arguments.

¶ 57    The prosecution has to prove each element of a crime beyond a reasonable doubt. *See People v. Clark*, 214 P.3d 531, 540 (Colo. App. 2009), *aff'd on other grounds*, 232 P.3d 1287 (Colo. 2010). This burden of proof cannot be shifted to a defendant. *Id.* Even if "a prosecutor's comments and questions . . . imply a defendant has the burden of proof, such comments and questions do not necessarily shift the burden of proof, constituting error." *People v. Santana*, 255 P.3d 1126, 1131 (Colo. 2011). A court must instead assess whether the prosecution shifted the burden of proof in light of the entire record. *Id.*

¶ 58    The first statement that Monte claims shifted the burden of proof was when the prosecutor said, "For you to find the defendant not guilty, you would need to believe every single version of their events." While defense counsel objected to this statement, she did not object to burden shifting, and therefore this claim is

26

unpreserved and reviewed for plain error. *See People v. Ujaama*, 2012 COA 36, ¶ 37.

¶ 59 While this statement arguably constitutes burden shifting, it is not "flagrantly, glaringly, or tremendously improper" as to constitute plain error. *Domingo-Gomez*, 125 P.3d at 1053. In addition, the court correctly instructed the jury at the conclusion of trial that the defendant was presumed innocent, and the prosecution had the burden of proof and needed to prove each element beyond a reasonable doubt. *Santana*, 255 P.3d at 1131-32.

¶ 60 The second statement that Monte claims shifted the burden of proof was "[a]ll of these things would have to be true. That Ms. Tallant got in a bar fight, but the bruises somehow don't show up for that kind of assault, and they don't show up until two days later somehow. It's spontaneous bruising two days after the fight. That would have to be true. You would have to accept that fact as true." The defense objected to the statement and claimed that the prosecution was burden shifting. The court overruled the objection, but then it reminded the jury that "the People hold the burden of proof and must prove all elements beyond a reasonable doubt. The

defendant does not hold any burden of proof with regards to the charges in this case."

¶ 61    Monte is correct that the jurors would not need to believe that Tallant got into a bar fight to acquit him.  It was always the prosecution's burden to prove Monte's guilt beyond a reasonable doubt.  *See People v. Heilman*, 52 P.3d 224, 227 (Colo. 2002) ("The burden of proof . . . always remains with the prosecution.").  But in light of the entire record and the court's instructions on the burden of proof, we can't conclude that this statement shifted the burden to Monte.

### 5.    Appealing to Juror Sympathies and Prejudices

¶ 62    Prosecutors cannot make arguments that are intended to "inflame the passions or prejudice of the jury."  *Mendenhall*, ¶ 78 (quoting *People v. Dunlap*, 975 P.2d 723, 758 (Colo. 1999)).

¶ 63    Monte contends that the prosecution appealed to the jury's sympathy, inflamed the jury's passions, and mischaracterized and denigrated the defense and Monte six times during closing argument.  We address each claim in turn.

28

¶ 64    First, Monte argues that the prosecutor denigrated the defense when she stated that the "[d]efense wants you to disregard the entire [strangulation] story because of tiny minute details, details they described as minor because that's all they have.  They even resort to slut-shaming Ms. Tallant for trying to move on."  The defense objected to the statement, and the court sustained the objection.  The court then instructed the jury to "disregard the statement."

¶ 65    While Monte acknowledges that he obtained relief when the court sustained his objection, he claims that the prosecutor "doubled down" when she subsequently said, "Ladies and gentlemen, you have your notes.  You know what the testimony was, and you're going to be able to look back at that testimony."  Monte does not explain why this statement "doubled down" on the prosecutor's slut-shaming comment, nor do we see how urging the jurors to refer to their notes reinforces the statement.  Moreover, Monte obtained relief when the court sustained his objection and instructed the jury to disregard the statement.  And he didn't seek further relief after the conduct he perceives as "doubling down."  *See Garcia,* 526 P.2d at 294; *Douglas,* ¶ 65.

¶ 66 Second, Monte challenges an analogy that "appealed to and inflamed the jury's passions and emotions." The prosecutor said, "Think of [these events] as a gun analogy. If someone pulls a gun and says, I'm going to kill you, you need to die, and then pulls the trigger, that's easily accepted as attempted murder. And the issue here is that the method the . . . defendant used was the most lethal form of intimate partner violence: strangulation. Every time he wrapped his hands around her throat and squeezed, he pulled the trigger." The defense objected to this statement, and the trial court overruled its objection. The prosecutor then continued, "When he threw her down the stairs and she blacked out, he pulled the trigger. When he beat her until she lost consciousness, he pulled the trigger."

¶ 67 While the prosecution cannot appeal to the passions and prejudices of the jury, "[i]n closing argument, [a prosecutor] may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance." *People v. Ortega*, 2015 COA 38, ¶ 52 (alteration in original) (quoting *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003)). This is exactly what the prosecutor did here, using the gun analogy to describe how Monte was "pulling the

trigger" each time he strangled Tallant until she lost consciousness, beat her, and threw her down the stairs.

¶ 68   Third, Monte argues that the prosecutor disparaged the defense's argument when she said, "The defense got up here on their closing . . . statement and essentially tried to bash Ms. Tallant's credibility." The defense objected to the statement, and the court sustained its objection. The court then instructed the jury to disregard the statement as to "bash." As before, Monte obtained relief through a sustained objection and a curative instruction. And he didn't seek further relief. *See Garcia*, 526 P.2d at 294; *Douglas*, ¶ 65.

¶ 69   Fourth, Monte argues that the prosecutor "mischaracterized and denigrated the defense" when she stated that the "[d]efense wants you to find the defendant not guilty of attempted murder because he didn't keep trying to murder her." The defense objected to this statement, and the court sustained the objection. The prosecution did not continue this line of argument. Again, Monte obtained relief from the court. *See Douglas*, ¶ 65.

¶ 70   Fifth, Monte argues that the prosecutor denigrated Monte when she referred to him as a "bully." The prosecutor explained

31

why Tallant was initially hesitant to report the incident to the police when they first arrived at her house and said, "Of course she's not going to say anything. Her bully is right there." The defense objected, and the court overruled the objection.

¶ 71    As Monte points out, "courts have uniformly condemned as improper a prosecutor using such terms as 'rat,' 'dog,' or 'animal,' to describe a defendant." *People v. Hernandez*, 829 P.2d 394, 396 (Colo. App. 1991). The term "bully" is not among these terms, which are more denigrating and dehumanizing. Given the facts of this case, we consider the use of the word "bully" as an oratorical embellishment rather than improper conduct. *See Ortega*, ¶ 52.

¶ 72    Sixth, Monte argues that the prosecutor appealed to the jurors' emotions when, in response to the defense's speculation as to FNE Hunsaker's decision not to suggest follow-up care for Tallant, the prosecutor said, "The defendant wants you to believe there's no serious bodily injury because the nurse didn't force the victim into a follow-up, as if that's relevant. They want you to believe that she didn't suffer serious bodily injury because [FNE] Hunsaker refused to subject her to another kidnapping." Monte did not object to this statement, so we review it for plain error.

¶ 73　While dramatic, the statement was more of a rhetorical device than improper argument. *Ortega*, ¶ 52. And to the extent it was improper at all, it certainly wasn't "flagrantly, glaringly, or tremendously improper." *Domingo-Gomez*, 125 P.3d at 1053.

¶ 74　Given all of this, we conclude that there were no instances of prosecutorial misconduct that require reversal in this case.

### E.　Mistrial

¶ 75　Monte also contends that the trial court erred by applying an appellate standard of review in evaluating whether the effect of the multiple alleged instances of prosecutorial misconduct required a new trial. It's true that the court noted that the defense had not objected to some statements. But then the court detailed on the record why — for many of the reasons described above — it didn't find many of the statements in closing argument significantly prejudicial. On this record, we can't conclude that denying the drastic remedy of a mistrial was a gross abuse of the trial court's discretion. *See People v. Peoples*, 8 P.3d 577, 580 (Colo. App. 2000).

## F. Cumulative Error

¶ 76    Lastly, Monte contends that the cumulative effect of prosecutorial misconduct warrants a new trial.

¶ 77    The cumulative error doctrine applies when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (alteration in original) (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)). Considering the cumulative effect of the errors we identified or assumed, we still conclude that they did not substantially affect the fairness of the trial or the integrity of the fact-finding process. We therefore reject Monte's final contention.

## III. Disposition

¶ 78    The judgment is affirmed.

JUDGE FOX and JUDGE SULLIVAN concur.